71 N.J. Super. 156 (1961)
176 A.2d 500
JERSEY CITY MERCHANTS COUNCIL, A CORPORATION OF NEW JERSEY, HARRY F. SALOMON AND CHARLES B. SWENSEN, INC., A CORPORATION OF NEW JERSEY, PLAINTIFFS-APPELLANTS,
v.
CITY OF JERSEY CITY, A MUNICIPAL CORPORATION, AND PHILIP B. ROBINSON, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 27, 1961.
Supplemental Briefs filed December 4, 1961.
Decided December 26, 1961.
*158 Before Judges GOLDMANN, FOLEY and ROSEN.
Mr. Atwood C. Wolf argued the cause for appellants (Messrs. Wolf & Baumann, attorneys; Mr. Wolf, on the brief).
Mr. Joseph G. Mintz, Assistant Corporation Counsel, argued the cause for respondent City of Jersey City (Mr. Ezra L. Nolan, Corporation Counsel, attorney; Mr. Mintz, on the brief).
Mr. Benjamin H. Chodash argued the cause for respondent Philip B. Robinson (Messrs. Krieger and Chodash, attorneys).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiffs instituted a taxpayers' action in lieu of prerogative writs to set aside a public sale by defendant municipality to defendant Robinson of certain city-owned land, and to declare such sale, the resolution which authorized it, and the resolution purporting to confirm it, to be ultra vires and therefore void. The case *159 was tried before the Law Division judge sitting without a jury. His written opinion disposed of all issues in favor of defendants. Plaintiffs appeal the resulting judgment.

I.
Jersey City had acquired the land in question by foreclosure in 1954. On October 20, 1959 the Jersey City Board of Commissioners adopted a resolution authorizing the public sale of some 76 parcels of city-owned lands and buildings, including the subject premises comprising some 60 acres of vacant land. The resolution was published three times in the local newspapers under the caption, "Public Sale, Monday, Nov. 9th, 1959."
The resolution announced that in accordance with the provisions of R.S. 40:60-26, as amended and supplemented, the listed properties, not needed for public use, would be offered at public sale at the City Hall on Monday, November 9, 1959, at 10 A.M., to the highest bidder at no less than the minimum price set forth for each parcel. All sales were to be made subject "to such state of facts as an accurate survey may disclose, existing tenancies, rights of persons in possession, zoning ordinances, City Ordinance No. K-1455, easements, conditions, covenants and restrictions of record or otherwise, violations of the regulations and requirements of the Building Department, the Health Department and the Police and Fire Departments of the City of Jersey City. No representations of any kind are made by the City of Jersey City as to the condition or status of the property."
The 60-odd acres of vacant land with which we are concerned were separately dealt with at the close of the resolution and the public notice. The minimum price was fixed at $60,000 and the sale was to be upon the conditions set out earlier in the resolution, among them those just referred to. It was also to be subject to the following conditions:
*160 "* * * Upon the further condition that the purchaser shall fill and grade the entire lands to one (1) foot above the existing grade of Route 440. The filling and grading shall commence within six (6) months from the date of confirmation of sale and shall be completely filled and graded within two (2) years of the starting date; and
Upon the further condition that the purchaser shall construct a dike or embankment along the westerly property line to retain any and all fill that shall be deposited on the easterly side of said property line. This dike or embankment shall be designed to withstand the pressure of the land filled on the easterly side and it shall be constructed to the satisfaction of the Chief Engineer of the Department of Parks and Public Property of the City of Jersey City; and
Upon the further condition that the purchaser shall erect thereon a non-residential building or buildings covering a ground area of five hundred thousand (500,000) square feet. The construction of said building or buildings shall be completed within four (4) years of the date of confirmation of the sale. The purchaser shall begin the construction of a non-residential building or buildings covering a ground area of three hundred thousand (300,000) square feet within eighteen (18) months of the date of confirmation of sale and shall complete the construction of the three hundred thousand (300,000) square feet within three (3) years of the date of confirmation of the sale.
The purchaser shall begin the construction of a non-residential building or buildings covering an additional two hundred thousand (200,000) square feet of ground area within thirty-six (36) months from the date of confirmation of the sale and complete the construction of the additional two hundred thousand (200,000) square feet within one (1) year of the starting date."
Five bidders appeared at the November 9 sale. Before bidding began, William P. Black, Assistant Tax Collector of Jersey City, read the terms and conditions of the sale in full and then addressed the bidders as follows:
"I direct your attention to Paragraph 2. As to the existing tenancies, all tenants are 30-day tenants with the exception of the Incinerator Authority who occupies a portion at the will of the City Commission. At any time when you feel they interfere with your developing the property, their tenancy can be terminated on notice to the City Commission. They are engaged in filling city owned lands."
Black testified that he then asked of those present, "Do these facts interfere with your bidding in any way?" Receiving a "No" answer from the five bidders, he announced, "We will *161 now proceed with the bidding. The first bid is $60,000 [the advertised minimum price]." After a prolonged series of increased bids, the property was struck down to defendant Robinson for $125,000. The sale was confirmed by resolution adopted by the City Commission by a 4-1 vote on November 17, 1959. Plaintiffs instituted the present action soon after.

II.
N.J.S.A. 40:60-26, the statute here involved, provides that a municipal governing body may sell any lands or buildings not needed for public use in one of four ways, the first of which is by public sale to the highest bidder after public advertisement thereof in a newspaper circulating in the municipality where the lands are situate. In such case the governing body may by resolution fix a minimum price, to be included in the public notice of sale. The final paragraph of the statute provides that
"* * * The governing body may also impose any restrictions on the use to be made of such land and any conditions of sale as to buildings or structures to be erected thereon, or as to the type, size, or other specifications of such buildings or structures, * * * and the time within which such conditions of sale in the manner and to the same extent as any other vendor of real estate * * *; provided, however, that * * * the restrictions on the use to be made of the land and the conditions of sale shall be set forth at length in any advertisement of sale hereinabove required. * * *"

III.
Plaintiffs' first attack upon the resolution and notice of sale is directed to the requirement that the successful bidder construct a dike or embankment, designed to withstand the pressure of the land fill, "to the satisfaction of the Chief Engineer" of the Parks and Public Property Department. They contend that the absence of a norm, standards or details of construction by which the engineer's approval would be granted or withheld, voids the sale under the statute.
*162 In Lieberman v. Neptune Twp., 50 N.J. Super. 192, 198-199 (1958), we observed that the final paragraph of N.J.S.A. 40:60-26, permitting a municipal governing body to impose restrictions and conditions on the sale of lands no longer needed for public use, does not permit a municipality to deal with its real estate absolutely and without limit, and to impose upon potential bidders any restrictions or conditions whatsoever:
"* * * The municipal action is always subject to scrutiny to insure that the conditions and restrictions imposed be reasonable and consistent with the public policy underlying the statute to prevent favoritism and assure uniform conditions for bidding and the best deal for the benefit of all the taxpayers of the municipality. Case v. Trenton, 76 N.J.L. 696, 699 (E. & A. 1908); Juice Bar Corp. v. Township Committee of Neptune Tp., supra, 36 N.J. Super. [164], at pages 170-171; Escrow v. Borough of Haworth, supra [36 N.J. Super. 469 (App. Div. 1959)]; Summer Cottagers' Ass'n of Cape May v. Cape May, 34 N.J. Super. 67, 78 (Law Div. 1954); Samuel v. Wildwood, 47 N.J. Super. 162, 169 (Ch. Div. 1957). * * *"
The public policy noted in Lieberman is the same as that which underlies the other competitive bidding statutes. See N.J.S.A. 40:50-1; Hillside Twp. v. Sternin, 25 N.J. 317, 322 et seq. (1957); Greenberg v. Fornicola, 65 N.J. Super. 104, 109 (App. Div. 1961), certification granted 36 N.J. 28 (1961); 10 McQuillin, Municipal Corporations (3d ed. 1950), § 29.52, p. 312. N.J.S.A. 40:60-26, like N.J.S.A. 40:50-1, is for the benefit of the taxpayers and not the bidders, and should be construed with sole reference to the public good. Our courts have uniformly declared invalid municipal transactions where performance was required to be "to the satisfaction" of a particular municipal officer, or even the governing body. See Juice Bar Corp. v. Neptune Township Committee, 36 N.J. Super. 164 (App. Div. 1955) (approval of the building inspector or other official designated by the township committee); Tice v. Long Branch, 98 N.J.L. 214 (E. & A. 1922) (satisfaction of the board of commissioners); Waszen v. Atlantic City, 1 N.J. 272 (1949) *163 (discretion of the board of commissioners); Armaniaco v. Cresskill, 62 N.J. Super. 476 (App. Div. 1960) (concurring opinion of Judge Conford at page 488  opinion of the engineer); cf. Jamouneau v. Local Government Board, 6 N.J. 281, 287 (1951).
The requirement that the dike or embankment be constructed "to the satisfaction of the Chief Engineer," without any norm, construction details or standards to control the granting or withholding of approval, clearly falls within the principles enunciated in our cases and is a trespass upon the statute. If the condition be regarded as vesting absolute discretion in the chief engineer, the sale would certainly be open to attack. See Waszen v. Atlantic City, above, 1 N.J., at page 280, and the concurring opinion in Armaniaco, above. Even if the "satisfaction of the Chief Engineer" be considered as nothing more than a requirement that the dike or embankment be sufficient, on an engineering basis, to hold back the fill, no one who might have been interested in bidding, and no bidder who actually appeared at the public sale, could know in advance whether the chief engineer would be satisfied with one type of construction or another. The dike or embankment might be of rock, concrete, crushed stone, or even of stout planking held in place by heavy posts. The difference in the cost of these various types of construction removed one of the competitive bases upon which intelligent bids could have been made. Where there is no standard or norm to guide or control an engineer in the exercise of a power such as was given the chief engineer here, the possibility of partiality or even fraud is present. There is no need to prove actual fraud or favoritism or collusion to set aside the sale; it is enough that the possibility exists. Summer Cottagers' Ass'n of Cape May v. Cape May, 19 N.J. 493, 501 (1955), affirming 34 N.J. Super. 67 (Law Div. 1954); Asbury Park Press, Inc. v. Asbury Park, 23 N.J. 50, 53-54 (1956), where our highest court noted that the absence of corrupt motive does not preclude the judicial remedy; municipal action should be *164 vacated where it amounts to a fraud on the bidding statute, even in the presence of good faith.

IV.
Plaintiffs advance a second equally persuasive reason for setting aside the sale. They point to the condition in the resolution and notice of sale that the successful bidder erect "a non-residential building or buildings covering a ground area of 500,000 square feet," construction to be completed in accordance with the schedule which had been fixed by the governing body. Here, again, they make the valid argument that the condition lacks any norm or sufficiently definite standard.
In the Juice Bar case, above, 36 N.J. Super. 164 (App. Div. 1955), the notice of sale required the successful bidder "to erect dwellings, construct or reconstruct all roads adjoining said lots, provide curbs, water, sanitary sewers, and whatever other service or requirement within a reasonable time after taking title [sic]." Bidders were to submit plans of the type of buildings proposed to be erected, at least three days before the sale, so that they might be examined and approved by the building inspector or other official designated by the township committee. The court held that
"While the pertinent statute permits the governing body to impose `any conditions of sale as to buildings or structures to be erected' on the lands, or `as to the type, size or other specifications of such buildings or structures,' it carries the mandate that `the restrictions on the use to be made of the land and the conditions of sale shall be set forth at length' in the advertisement. The reasonable import of this provision, if regarded as applicable to a condition obligating the purchaser to an affirmative future accomplishment, is that the condition shall be clearly and precisely expressed in the advertisement and be applicable in common to all bidders.
Here the design was to allow each bidder to propose his own type of dwelling and to enable the municipal governing body, presumably with the advice of the building inspector, to examine the variety of types and to prefer and adopt any one of them.
*165 Assuredly, the method of soliciting bids at a public sale which was employed in this instance offended the fundamental statutory object of competitive proposals." (at page 169)
The case is squarely in point. See also, Casey v. Gloucester City, 42 N.J. Super. 189 (Ch. Div. 1956).
Summer Cottagers' Ass'n of Cape May v. Cape May, above, 34 N.J. Super. 67 (Law Div. 1954), may be distinguished, for there the structures to be built were on file at the city hall and were available to prospective bidders. Samuel v. Wildwood, 47 N.J. Super. 162 (Ch. Div. 1957), relied upon by the trial judge, called for a minimum expenditure of $150,000 for the modern stores, motel and off-street parking facilities to be constructed on the lands being sold.
N.J.S.A. 40:60-26, quoted earlier in this opinion, requires that the conditions of sale "be set forth at length" in the advertisement of sale. Thus, the power to impose conditions "as to buildings or structures to be erected thereon, or as to the type, size, or other specifications of such buildings or structures," must be stated at length in the required notice of sale. That was not done in this case.
The requirement here that the successful bidder erect "a non-residential building or buildings covering a ground area of five hundred thousand (500,000) square feet" provides little that is significant in the way of additional criteria beyond those unfavorably dealt with in the Juice Bar case. Although it might not be practical, from the point of view of attracting many bidders, to require that the governing body set out to the last detail just what sort of a structure it required be erected on the lands offered for sale, we have not even the barest minimum of a specification or standard in this case. Bidders knew little more than that they would be required to erect a non-residential building or buildings which, eventually, would cover 500,000 square feet. The number of buildings, the particular type of buildings, the materials to be used, or even the minimum cost, was not indicated. A bidder might have in *166 mind the plainest functional type of a warehouse, erected in a manner that would meet the minimum of the building code. Or he might have in mind a shopping center, as it is suggested that the successful bidder here proposes to build. As in the Juice Bar case, it was left entirely to each bidder to decide for himself and bid accordingly. In short, as in that case and in Casey v. Gloucester City, above, there was absent a definite common standard to which all proposals alike could relate. As was said in Hillside v. Sternin, 25 N.J., at pages 322-323, in another setting:
"The conditions and specifications must apply equally to all prospective bidders. Otherwise, there is no common standard of competition. Every element which enters into the competitive scheme should be required equally for all and should not be left to the volition of the individual aspirant to follow or to disregard and thus to estimate his bid on a basis different from that afforded the other contenders."
Cf. Greenberg v. Fornicola, above, 65 N.J. Super., at pages 109-110.

V.
We need only briefly consider plaintiffs' third point  that the unauthorized announcement made by Assistant Tax Collector Black at the sale modified or deviated from the advertised conditions and therefore nullified the sale.
The resolution and notice of sale required that the successful bidder fill and grade the entire parcel to one foot above the existing grade of Route 440, within a time specified. Thus, anyone reading the public notice and who might be interested in bidding, was formally notified that, if successful at the sale, he would have to bear the expense of filling and grading the entire acreage. From our reading of the record, the parcel might at best be described as swampy. The cost of filling and grading it would be considerable.
The Jersey City Incinerator Authority had been dumping clean residue and ashes on the property by permission of *167 the governing body. The sale, as noted, attracted only five bidders, and before the bidding opened, Mr. Black made the announcement which we have set out at length in the first part of this opinion. He had no authority to make the announcement, since it was not contained in the resolution or public notice of sale. Buckley v. Mayor, etc. of Jersey City, 105 N.J. Eq. 470, 475 (Ch. 1930), affirmed o.b. 107 N.J. Eq. 137 (E. & A. 1930). In effect, he was telling the bidders present that the Incinerator Authority was then engaged in filling city-owned land as a tenant at will. If the successful bidder at any time felt this was interfering with the development of the property, the tenancy would be terminated on notice to the governing body. The five men present therefore knew that if it suited the purpose of the successful bidder, the Incinerator Authority would continue filling the land, and in so doing reduce the expense which the buyer would otherwise have to bear.
Defendants make the point that a person is chargeable with notice as to such facts concerning the tenancy of real property as an inquiry of those in physical possession would have revealed. Like the trial court, they cite in support the case of Schnakenberg v. Gibraltar S. & L. Ass'n, 37 N.J. Super. 150 (App. Div. 1955). However, this obligation does not attach to inquiries from tenants not in visible possession. Cf. Field v. Kantrowitz, 98 N.J. Eq. 167 (Ch. 1925), 99 N.J. Eq. 706 (Ch. 1926), affirmed 99 N.J. Eq. 847 (E. & A. 1926). The Incinerator Authority was not in open and visible possession of the premises at the time of the advertisement and the sale, so that a prospective purchaser would not, except by sheer accident, find out about its operations at the site.
The situation then, was that those who might have been interested in bidding but did not attend the sale because of the expense they knew would be involved in filling the land to the required height, were deprived of any knowledge of an important and material fact, first revealed by Mr. Black at the sale proper. It is entirely possible that had they *168 known of the Incinerator Authority's filling operation, they would have been more attracted to the possibilities of buying and developing the tract. Clearly, the five men who did appear at the sale received information which had been denied the general public.
The only proper thing for the governing body to have done was to have made a complete disclosure in its resolution and in the public notice of sale. The same opportunity for favoritism, collusion and fraud as was discussed in connection with treatment of plaintiffs' first objection, was present here.

VI.
There remains for consideration plaintiffs' final contention that the resolution authorizing the sale was ultra vires and void "in a primary sense because the subject premises were in fact then actually needed for public use."
N.J.S.A. 40:60-26 provides that a municipal governing body "may sell any lands or buildings or any right or interest therein not needed for public use." Plaintiffs argue that the formal declaration of the governing body that the tract in question, like the other parcels offered for sale, was "not needed for public use," finds no support in the record. They point out that the Incinerator Authority is by statute declared to be "a public body politic and corporate constituting a political subdivision of the State established as an instrumentality exercising public and governmental functions to provide for the public health and welfare," N.J.S.A. 40:66A-7. Further, N.J.S.A. 40:66A-4(a) characterizes such an authority as "an agency and instrumentality" of the municipality creating it. Under N.J.S.A. 40:66A-6, 7(5) and 17, an authority is fully empowered to take for public use real property, within or without the district, which it deems necessary for its purposes, and such taking may be by condemnation under R.S. 20:1-1 et seq. Plaintiffs then argue that when the resolution was adopted, as well as when the sale was actually held, and for more than *169 six months thereafter, the subject premises were actually needed for public use by the Incinerator Authority. Accordingly, they say, the governing body of Jersey City had no right, in authorizing the sale of the 60-odd acres, to declare that they were not needed for public use.
The Incinerator Authority's limited right to use the property came about in this fashion. On November 21, 1958 the secretary of the Authority wrote the Jersey City Board of Commissioners that the Authority had by resolution authorized the acquisition of lands for the dumping of burned waste and non-combustibles. It requested the governing body to negotiate with the Authority with a view to acquiring such lands without resort to condemnation proceedings. This brought a reply from Commissioner Murray, Director of Revenue and Finance, stating that his office had jurisdiction over several hundred acres of vacant city-owned land, most of which required fill to grade level for eventual sale and industrial development. The Authority was invited to place its non-combustible waste, cleaned for land fill, on these premises. The Commissioner said that he was assigning Assistant Tax Collector Black to discuss the matter with the Authority and to work out a program. Eventually, on September 14, 1959 Commissioner Murray wrote the Authority that, "Until further notice from this department" it was authorized to place clean fill on the city property "north of the Central Railroad embankment and west of Route 440 up to road level grade." This area included the lands in question. The letter went on to say that
"It is clearly understood that the City may withdraw this permission or modify it at any time by a similar letter to the Incinerator Authority."
The Authority met on November 5, 1959 to discuss its position with regard to the impending sale of the tract. The minutes of that meeting show that the members present *170 discussed what action should be taken to protect the Authority's position by putting the governing body on notice of its desire and need to use the land. It was recognized that the sale would automatically eliminate any previous commitment by the city. It was also pointed out that by the terms of the September 14, 1959 letter, referred to above, the city could at any time revoke the Authority's right to come on the property. The consensus was that the Authority "should do nothing to interfere with the sale of the property in the interest of Jersey City"; that the promise of the Commissioner to protect the agency was acceptable; and the Authority would "continue in its operations and plans to use the area until officially notified to desist."
The Authority, as already stated, has the power to "acquire, in its own name but for the local unit or units [municipality or municipalities creating the agency], by purchase, gift, condemnation or otherwise," property necessary to its operations. N.J.S.A. 40:66A-6. The tenancy at will enjoyed by the Authority was granted it by defendant municipality under N.J.S.A. 40:66A-19. That the tenancy was subject to revocation at any time was clearly recognized by the Authority.
There is nothing that stands in the way of the Authority, an autonomous body, from acquiring lands elsewhere in the general area of Jersey City. The plant superintendent of the Authority admitted on cross-examination that though it would be advantageous to use the 60-acre area, that was not a necessity, for other areas could be used. Indeed, there is evidence of additional city-owned lands which the Authority could use.
What plaintiffs' argument amounts to is simply this: whether the property in question is any longer needed for public use is to be determined not by the governing body, but by the fact that the Authority has used the lands and would probably like to continue doing so. Not only did the Authority determine that it would do nothing to interfere *171 with the sale on November 9, but it has registered no complaint regarding that sale, nor is it a party to the present litigation. Of course, no condemnation proceedings have ever been proposed or taken for or on behalf of the Authority, involving this property.
The governing body is the sole constituted authority authorized under the statute to determine whether or not the property is actually needed for public use. Its determination that the land is no longer needed for public use should not, in the light of the proofs presented, be overturned. No abuse of discretion has been shown. As in the case of other municipal action, courts are loath to interfere unless it clearly be established that there was an abuse of authority. Cf. Camden Plaza Parking, Inc. v. Camden, 16 N.J. 150, 157, 158 (1954); Edelstein v. Asbury Park, 51 N.J. Super. 368, 390-391 (App. Div. 1958); Whelan v. Borough of Chatham, 9 N.J. Super. 341, 345 (Law Div. 1950).
For the above reasons the judgment of the Law Division is reversed.