JERSEY CITY MERCHANTS COUNCIL, A CORPORATION OF NEW JERSEY, HARRY F. SALMON AND CHARLES B. SWENSEN, INC., A CORPORATION OF NEW JERSEY, PLAINTIFFS-RESPONDENTS, v. CITY OF JERSEY CITY, A MUNICIPAL CORPORATION, DEFENDANT, AND PHILIP B. ROBINSON, DEFENDANT-APPELLANT.

Argued October 9, 10, 1962—Decided December 17, 1962.

*Mr. Carl Kisselman* argued the cause for defendant-appellant (*Messrs. Kisselman, Devine, Deighan & Montano,* attorneys; *Mr. Harold Krieger,* of *Krieger & Chodash,* of counsel; *Mr. Michael Patrick King,* on the brief).

*Mr. Atwood C. Wolf* argued the cause for plaintiffs-respondents (*Messrs. Wolf & Baumann,* attorneys; *Mr. Atwood C. Wolf,* on the brief).

*Mr. Meyer Pesin* argued the cause for defendant City of Jersey City.

The opinion of the court was delivered by

HANEMAN, J. The issue here involved is the validity of a sale of real estate by the City of Jersey City (Jersey City) to Philip B. Robinson (Robinson).

On October 14, 1959 Robinson made an offer in writing to Jersey City to purchase 60 acres of land theretofore acquired by it as the result of a tax foreclosure and known as Block 1751 — Plot 10B; Plot 10C; Plot 10D; Plot 10E; Old part of Plot 10A, and Block 1746½—Part of Plot H1; Part of Plot G; Part of Plot K as indicated on Map approved February 27, 1957. The Board of Commissioners of Jersey City adopted a resolution on October 20, 1959, declaring that some 75 parcels of land, including the lands for the purchase of which Robinson had made said offer, were not needed for public use and directing the sale thereof at public auction on November 9, 1959, pursuant to *N. J. S. A.* 40:60–26(a). Notice of the sale was duly published

in accordance with the provisions of said statute. The notice contained the following general conditions:

"(2) All such sales are to be made subject to such state of facts as an accurate survey may disclose, existing tenancies, rights of persons in possession, zoning ordinances, City Ordinance No. K-1455, easements, conditions, covenants and restrictions of records or otherwise, violations of the regulations and requirements of the Building Department, the Health Department and the Police and Fire Departments of the City of Jersey City. No representations of any kind are made by the City of Jersey City as to the condition or status of the property."

and the following specifications and conditions solely applicable to the lands in Blocks 1751, 1746½:

"* * * and upon the further condition that the purchaser shall repair the existing storm sewer and construct and extend this storm sewer from its present terminus to ten (10) feet beyond the Westerly property line, under the supervision of the Chief Engineer of the Department of Public Works of the City of Jersey City; and upon the further condition that the purchaser shall fill and grade the entire lands to one (1) foot above the existing grade of Route 440. The filling and grading shall commence within six (6) months from the date of confirmation of sale and shall be completely filled and graded within two (2) years of the starting date; and

Upon the further condition that the purchaser shall construct a dyke or embankment along the Westerly property line to retain any and all fill that shall be deposited on the Easterly side of said property line. This dyke or embankment shall be designed to withstand the pressure of the land filled on the Easterly side and it shall be constructed to the satisfaction of the Chief Engineer of the Department of Parks and Public Property of the City of Jersey City; and

Upon the further condition that the purchaser shall erect thereon a non-residential building or buildings covering a ground area of five hundred thousand (500,000) square feet. The construction of said building or buildings shall be completed within four (4) years of the date of confirmation of the sale. The purchaser shall begin the construction of a non-residential building or buildings, covering a ground area of three hundred thousand (300,000) square feet within eighteen (18) months of the date of confirmation of sale and shall complete the construction of the three hundred thousand (300,000) square feet within three (3) years of the date of confirmation of the sale.

The purchaser shall begin the construction of a non-residential building or buildings covering an additional two hundred thousand (200,000) square feet of ground area within thirty-six (36) months

from the date of confirmation of the sale and complete the construction of the additional two hundred thousand (200,000) square feet within one (1) year of the starting date.

The cost of the construction of the storm sewer and any additional sanitary sewers, roads, water mains and all utilities shall be borne by the purchaser.

THE MINIMUM PRICE is ............. $60,000. No commission will be paid to any broker or any person consummating the sale of Block 1751 – Plot 10B; Plot 10C; Plot 10D; Plot 10E; Old part of Plot 10A Block 1746½ – Part of Plot H1; Part of Plot G; Part of Plot K as indicated on Map approved February 27, 1957. Route 440."

On September 14, 1959, James F. Murray, Jr., Director of Revenue and Finance of Jersey City, had forwarded a letter to the Jersey City Incinerator Authority (Incinerator Authority) concerning the lands here involved, which read:

"In accordance with our conference of last week please accept this as authority until further notice from this department to place the clean fill of the incinerator on the City property north of the Central Railroad embankment and west of Route 440 up to road level grade.

It is clearly understood that the City may withdraw this permission or modify it at any time by a similar letter to the Incinerator Authority."

Under date of November 7, 1959, Frank H. Touhy, Chairman of the Jersey City Incinerator Authority, wrote Murray as follows:

"You will recall that we have the right to place clean fill from the Jersey City Incinerator Authority on the City owned property north of the Central Railroad embankment and west of Route #440.

This right arises from your letter of authority dated September 14th, 1959. A copy of this letter is attached for your convenience.

Will you be kind enough to take whatever steps are necessary to protect the rights of the Authority in this matter under Paragraph 2 and the other conditions of public sale of the subject property scheduled for November 9th, 1959.

Please be assured that we will fully cooperate with the City and also the successful bidder in the exercise of our rights."

On November 9, 1959 William P. Black, Assistant Tax Collector of Jersey City, who conducted the sale, publicly

read the published terms and conditions thereof *verbatim* and requested bidders to step forward. Five responded. He then stated, pursuant to the Touhy request:

"I direct your attention to Paragraph 2. As to the existing tenancies, all tenants are 30-day tenants with the exception of the Incinerator Authority who occupies a portion at the will of the City Commission. At any time when you feel they interfere with your developing the property, their tenancy can be terminated on notice to the City Commission. They are engaged in filling City owned lands."

Inquiring of the prospective purchasers, "Do these facts interfere with your bidding in any way?" he received a unanimous answer in the negative. The sale was started with an initial offer of $60,000 and proceeded through 84 separate bids to the ultimate bid of $125,000 made by Robinson. There being no further offers, the lands were struck off to him at that figure. The sale was confirmed by a resolution of the Board of Commissioners of Jersey City on November 17, 1959.

On January 22, 1960 plaintiffs filed an action in lieu of prerogative writs, naming Jersey City as the sole defendant and reciting in separate counts three grounds for invalidating the sale: (1) Jersey City's failure to include in its public advertisement of sale any reference to the Jersey City Incinerator Authority agreement, and the Assistant Tax Collector's oral modification of the published terms of sale; (2) failure to delay the sale until the Incinerator Authority had filled the premises to grade; and (3) failure to particularize the zoning restrictions to which the lands were subject.

On April 28, 1960 plaintiffs amended their complaint by the insertion of a fourth count under which they sought to invalidate the sale upon the additional ground that the lands, contrary to the recital in the municipal resolution of October 20, 1959, were needed for public use. A fifth count was interjected joining Robinson as a defendant.

On December 21, 1960 plaintiffs filed a second amended complaint including a sixth count under which they sought to invalidate the sale for the supplemental reason that the published condition requiring the construction of a building covering a ground area of 500,000 square feet was defective in that it contained no plans or specifications, and no details of the type, size, height, quality, etc., of said building.

On February 20, 1961, at the pretrial proceeding, plaintiffs further amended their complaint with the inclusion of a charge that the sale was invalid because the conditions which related to the construction of a "dyke or embankment" were vague and indefinite. (It should be noted that the dyke had been completed and approved by the City Engineer on September 9, 1960 at a cost of $42,000 or more).

The matter having been brought on for trial, the Law Division found for the defendants and accordingly entered judgment in their favor. On appeal to the Appellate Division, Jersey City joined with Robinson in an attempt to sustain the trial court. The Appellate Division reversed the judgment of the Law Division, 71 *N. J. Super.* 156 (*App. Div.* 1961). Application having been made by Robinson, leave was granted to appeal to this court. 37 *N. J.* 87 (1962); *R. R.* 1:10–2. Contrary to the position which it maintained in the Appellate Division, Jersey City now joins with plaintiffs in attacking the sale.

Plaintiffs do not allege in their pleadings or briefs any actual fraud, corruption or breach of fiduciary relationship. *Cf. Driscoll v. Burlington-Bristol Bridge Co.,* 8 *N. J.* 433 (1952). On oral argument before this court, however, innuendoes not too thinly veiled were made to that effect. Such issue was not before the trial court nor the Appellate Division and is not before us. Indeed, there is no evidence at all of any fraud, corruption or breach of fiduciary relationship. Accordingly, we shall restrict our consideration to the points raised by the pleadings and argued in the briefs.

The three issues argued and the only questions with which we are concerned, for reasons expressed hereafter, are (1) the

failure to include in the public advertisement of sale, notice anent Jersey City's permission to the Incinerator Authority to dump waste on the subject property and the Assistant Tax Collector's alleged oral modification of the published terms of sale; (2) the alleged inadequacy of the specifications for the building required to be erected; and (3) the alleged inadequacy of the specifications for the dyke or embankment directed to be constructed.

In proceeding with the consideration of these three asserted grounds for reversal, *N. J. S. A.* 40:60–26 is relevant, and, as far as herein material, reads:

"* * * The governing body may also impose any restrictions on the use to be made of such land and any conditions of sale as to buildings or structures to be erected thereon, or as to the type, size, or other specifications of such buildings or structures, * * * and the time within which such conditions shall commence or be concluded, or any other conditions of sale in the manner and to the same extent as any other vendor of real estate, whether such sale shall be made at public or private sale; provided, however, that * * * the restrictions on the use to be made of the land and the conditions of sale shall be set forth at length in any advertisement of sale hereinabove required."

I.

Plaintiffs argue that the Jersey City-Incinerator Authority agreement was a material fact, advantageous to a prospective purchaser, which should have been revealed in the published notice of sale. This, they reason, arises from the fact that the successful bidder's compliance with the advertised condition that the lands be elevated to an established grade within two years of the confirmation of sale, involved the expenditure of a large sum of money, which they estimated to exceed $290,000. They further rationalize that the fill cost would be reduced greatly through the gratuitous use of the Incinerator Authority residue. Plaintiffs conclude that had notice of this arrangement been publicly advertised, the purchase of the lands would have attracted many more

bidders and consequently would have produced an increase in competition and an enhanced price for the property.

Basically, the answer to this argument lies in the fact that the arrangement with Jersey City did not constitute a contract which obligated Incinerator Authority to deposit any of its residue on the lands, nor did it create an irrevocable right so to do. Incinerator Authority was a mere licensee whose permissive right to dump was subject to termination at any time by its own act, or by the act of Jersey City, or by operation of law upon conveyance by Jersey City to a third party. *Eckert v. Peters*, 55 *N. J. Eq.* 379 (*Ch.* 1897). The continued use of the property by Incinerator Authority was of a most speculative and uncertain nature. At best, Incinerator Authority was merely one possible supplier with whom a purchaser could negotiate for future fill.

In any event, plaintiffs failed to prove that the Incinerator Authority waste was suitable fill upon which to erect a "nonresidential building" covering a ground area of 500,000 square feet, and therefore financially advantageous to a purchaser. To the contrary, there is evidence to sustain the conclusion that the deposited fill was so inadequate for industrial construction that if the lands were to be used for such purpose the Incinerator Authority waste would have to be removed and other material substituted therefor.

Nor does the testimony support plaintiffs' further statement that a great amount of residue had been deposited by Incinerator Authority prior to trial. The record discloses that up to that time very little waste had been dumped upon the 60-acre tract. Some dumping occurred upon a railroad right of way adjacent to the southern boundary of the lands here involved in connection with the Incinerator Authority's construction of a roadway for the passage of its dump trucks. The only such deposit on the subject lands in this connection was for the development of a "turn-around," approximately 10 or 12 feet in diameter, to be used in conjunction with said roadway. There also was evidence that a small amount of raw

garbage had been dumped during a strike of Incinerator Authority employees.

Therefore, the Jersey City-Incinerator Authority arrangement was not so material a fact nor of such advantage to a prospective purchaser as to require public disclosure in the published advertisement of sale.

Plaintiffs also argue that Black's oral announcement (quoted above) illegally modified the published terms of sale. For the reasons that have been expressed, the assistant tax collector's statement did not modify, nor was it intended to modify the published terms of sale required to be contained in the printed advertisement by the addition of an advantageous or detrimental condition. Quite apparently it was made only in courteous response to the request contained in the Incinerator Authority's letter of November 7, 1959. Plaintiffs' argument is addressed to a fact which does not exist.

## II.

Plaintiffs further argue that the advertisement was deficient in that it omitted to specify "any norms or definite standards as to type, size or other details of construction" for a "non-residential building or buildings covering a ground area of five hundred thousand square feet," required to be built by the successful bidder. The position of plaintiffs is that absent such detail, there is no common norm or standard upon which bidders could compete.

The public policy to secure competition and to guard against favoritism, improvidence, extravagance and corruption underlies both the sale of realty by a municipality and the award of contracts for the performance of work and supplying of materials to a municipality. This policy requires that a "public body shall prescribe a common standard on all matters that are material to the proposals, to the end that interested persons may bid intelligently and will be induced to bid by the promise of impartiality which only specifications of that quality can give." *Greenberg v. Fornicola*, 37 *N. J.* 1

(1962). The foregoing statement of identical basic principles, however, does not denote that the municipality is required to detail conditions of its proposed action in each of these categories with the same specificity.. This arises from the difference in the ultimate goals sought to be attained.

In connection with a construction contract, the municipality is concerned solely with obtaining a particular improvement according to predetermined plans and specifications, at the lowest price. This same general objective applies to the purchase of materials. Only by furnishing detailed plans and specifications can all prospective bidders antecedently be apprised of exactly what will be required, thus placing them on an even footing. The possibility of favoritism and speculation concerning a contractor's cost are thereby eliminated or at least reduced to a minimum. As a result, bidding is made attractive to a larger number of competitors and the probability that the municipality will receive that for which it seeks to bargain, at the least possible cost, is enhanced.

On the other hand, in the sale of land, a municipality may not be interested solely in price, although this is always a matter of prime importance. As with the case of a private owner, a municipality may dispose of some of its realty for manifold legitimate purposes which fail to include the acquisition of the highest price therefor. What was stated in *Greenberg v. Fornicola, supra,* 37 *N. J.* 1 in connection with the rental of municipal lands is equally applicable to the sale thereof. The court there said, at *p.* 6:

"Restrictions upon use of course may affect the bidding. Perhaps, analytically, they so operate by way of limiting the number of persons who are interested rather than by altering the common standard, *i. e.,* space and term. At any rate, the question is whether they are legally permissible, and if so, whether they may take the form the municipality here employed.

Although limitations upon use tend to reduce the likelihood of the greatest dollar yield, yet a prudent owner cannot be indifferent to the use of his property. Some uses may injure or degrade the premises or impair the return from the remainder of the property. And in special circumstances the owner may wish only a particular use, to

further another interest he has in the total scene, even though that use may not attract the highest rent. Thus, for any of the suggested reasons, good management may dictate that the owner accept something less than the best return."

Thus, by the application of this reasoning to the sale of realty, *N. J. S. A.* 40:60–26 authorizes the municipality to "impose any restrictions on the use to be made of such land and * * * conditions * * * as to buildings or structures to be erected thereon, or as to the type, size, or other specifications of such buildings or structures, * * * to the same extent as any other vendor of real estate * * *." A cataloging of some of the interests which a municipality may seek to further would include: (1) a beneficial return from the lands sold in the nature of increased future tax revenues when compared with the expenses for municipal services which the particular utilization of the realty will require; (2) maintenance of the characteristics of the neighborhood in which the land is located; (3) income to its inhabitants through employment or otherwise; (4) availability of additional housing facilities; and (5) the effect of the proposed use upon the value of other municipally owned lands.

As indicated above, in situations where the municipality seeks bids for a public improvement, exact plans and specifications must be furnished in order to alleviate or eliminate speculation as to cost requirements. This apprisal should result in more accurate estimates of the costs involved in the performance of the contract, and thereby all bidders are placed on an equal footing. Consequently, a larger number of competitors should be attracted because they are cognizant of both specifications and probable cost of performance.

However, in the sale of lands, the greater the specificity of the type of improvement, the more restricted is the field of possible purchasers, and hence of competitive bidders. Where the specifications for "the use to be made of such land and any conditions as to buildings or structures to be erected thereon" are reasonably general, the bidding is made attractive to a greater number of prospects. Thus, it may be said

that competition for the purchase of municipal lands is stimulated rather than stifled in direct proportion to the absence of restrictions affecting future use. Clearly, this is a result that is opposite to what occurs where the municipality seeks bids for a public improvement under general terms and conditions.

Furthermore, in the sale of lands, as the specifications for land use become more detailed, the opportunity for favoritism and collusion increases. As stated in *Greenberg, supra,* at *p.* 8:

"Indeed, the specification by the public body of a particular use can more readily be turned to an improper end, for the more specific the use, the fewer will be the interested parties. Here, as in other settings, undue specificity can be the vehicle for favoritism."

Again, this result is the opposite to that which would eventuate from the failure to set forth detailed plans and specifications for a public improvement. In seeking to obtain the combination of the highest price and a restricted use when selling its lands, a municipality therefore must be allowed a certain amount of liberality in detailing the "definite standards as to type, size or other details of construction," of the buildings to be erected.

It must be borne constantly in mind, however, that even though greater latitude is sanctioned in setting forth details of an improvement permitted or required to be made by a successful purchaser of municipal lands than is allowed in connection with an advertisement for bids for a public improvement, this power is not without limit. The municipality is required in both situations to observe the basic precept that a common standard must be sufficiently delineated in order that interested persons will be induced to bid by the promise of impartiality and may bid intelligently. It follows that each case must be considered on its own facts for the purpose of ascertaining whether such standard has been met. In *Samuel v. Wildwood,* 47 *N. J. Super.* 162, at *p.* 169 (*Ch.* 1957), which involved a sale under *N. J. S. A.* 40:60–26, the court said:

"Not only does the statute by its express terms provide that 'the conditions of sale shall be set forth at length,' but it is as well implicit in the grant of the power to sell at public vendue, subject to a condition providing for an affirmative future accomplishment by the purchaser, that such prospective condition shall be clearly and precisely expressed in the advertisement and be applicable and common to all bidders. The public policy of the State requires that there be a definite common norm or standard to which all competitive proposals must relate. Such a standard is the keystone to just and fair competition."

and again, at *p*. 170:

"It is self-evident that no hard and fast rule can be adopted which will delineate with specificity the particular language required in all advertisements of a sale subject to a future condition. In each case the exact verbiage must be considered to ascertain whether it fairly apprises a prospective bidder of the terms of the condition, and so is consistent with public policy. The touchstone of the determination is whether the printed advertisement created a norm or standard applicable and common to all bidders, and whether it was sufficiently specific, definite and intelligible in its terms to place all prospective bidders on an equal footing.

Where conditions appended to a sale concern themselves with some future improvement to the real estate, each specific, definite and minute specification of such improvement frequently cannot be set forth with particularity. It must follow in the very nature of things that some liberality in the statement of the conditions must be allowed, but by the same token, the conditions as expressed must be of such a nature as to fairly apprise prospective bidders of that which may be required by all in the future, and to furnish to all prospective bidders a common norm or standard."

In *Lieberman v. Neptune Twp.*, 50 *N. J. Super.* 192, at *p.* 198 (*App. Div.* 1958), the court said:

"The statutory language does not permit municipalities to deal with its real estate absolutely and without limit, as private vendors, and to impose whatever conditions or restrictions they may wish upon potential bidders. * * * The municipal action is always subject to scrutiny to insure that the conditions and restrictions *imposed be reasonable and consistent with the public policy underlying* the statute to prevent favoritism and assure uniform conditions for bidding and the best deal for the benefit of all the taxpayers of the municipality."

Here, the advertisement created a sufficient common norm or standard.

### III.

■ Plaintiffs challenge the sufficiency of the provision which reads:

"Upon the further condition that the purchaser shall construct a dyke or embankment along the Westerly property line to retain any and all fill that shall be deposited on the Easterly side of said property line. This dyke or embankment shall be designed to withstand the pressure of the land filled on the Easterly side and it shall be constructed to the satisfaction of the Chief Engineer of the Department of Parks and Public Property of the City of Jersey City."

■ They argue once again that there is a lack of common norm or standard in the requirement that "a dyke or embankment" be constructed, because of the absence of detailed construction specifications. This provision, they say, would permit any type of a multitude of retaining walls to be built. No proof was adduced that the words "dyke or embankment," in the context here used, have more than one meaning. Plaintiffs apparently suggest that this court take judicial notice of the words' ambiguous significance. This is not a matter of common knowledge such as to permit that result. To the contrary, the modification of the words "dyke or embankment" by the statement that it "shall be designed to withstand the pressure of the land filled," absent proof to the contrary, creates a sufficient minimal standard against which any proposed construction can be measured. The requirement for the approval of the City Engineer does not vest him with unlimited discretion to disapprove any "dyke or embankment." His judgment must be reasonably exercised. *Terminal Const. Corp. v. Bergen County, etc., Dist. Authority,* 18 *N. J.* 294, 316 (1955). Only if the wall were unable to withstand the pressure of the land filled would his disapproval be justifiable. We cannot say that the requirement for the dyke or embankment construction was obscure. On the record before us we must conclude that it sufficed to create a proper standard.

## IV.

Defendants' objections to the tardiness of plaintiffs' patchwork amendments to their complaint do not require consideration, in the light of the foregoing conclusions.

Reversed.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, SCHETTINO and HANEMAN—6.

*For affirmance*—None.