HERMAN M. WARD, *ET ALS.*, PLAINTIFFS-APPELLANTS, v. TOWNSHIP OF MONTGOMERY, *ET AL.*, DEFEND-ANTS-RESPONDENTS.

Argued November 18, 1958—Decided January 5, 1959.

*Mr. William E. Ozzard* argued the cause for plaintiffs-appellants (*Messrs. Beekman & Ozzard* and *Messrs. Mason, Griffin & Moore,* attorneys).

*Mr. George W. Allgair* argued the cause for defendants-respondents (*Mr. George W. Allgair* and *Mr. A. Dix Skillman,* attorneys).

The opinion of the court was delivered by

FRANCIS, J. Plaintiffs, taxpayers of the defendant Township of Montgomery, attack the validity of an amendment to its zoning ordinance which enlarged the manufacturing zone. The trial court sustained the municipal action, and we granted certification on our own motion of the appeal to the Appellate Division.

The township is a rural community primarily devoted to agricultural and residential pursuits. It contains an area of 31.8 square miles. Its growth has been slow. The 1950 population was 3,819; by 1954 only 81 new residents had been added. Of the total number, 1,500 persons are housed at the New Jersey Neuro-Psychiatric Institute at Skillman. The pace of residential development has been comparable. Between 1946 and 1957 only 214 new homes were built. A fertilizer packaging plant, a private sanitarium, a farm implement agency, and a few stores complete the picture of land · use. The only municipal services are schools, road construction and maintenance, and limited police protection. Under the original and amended zoning ordinance, only 6% of the total land area is allotted to commercial, industrial and manufacturing use.

The tax rate has shown an upward trend, particularly over the past five years. In 1957 it was $12.40; this year it dropped to $11.39, apparently as the result of a surplus

in the budget of the previous year. Schools loomed large in the cost of government. Their appropriation requirement for 1945 was \$38,216.90; for 1956–1957 it rose to \$180,895.95, and by 1957–1958 it had reached \$248,222.25. School construction seemingly had exhausted the borrowing capacity. The increasing tax burden, especially on the farmers, stimulated a desire on the part of persons actively interested in the problem to attract industrial ratables to the township. That purpose and the use of zoning to accomplish it became an issue in local political campaigns. The record reveals that it has been debated in 11 elections since 1953, and that in nine of them the voters favored the exertion of efforts to encourage industry to settle in Montgomery.

The first zoning ordinance was adopted in 1940 and with the 1941 amendment it divided the township into two zones, business and residential. The business zone was rather unusual. A branch of the Reading Railroad ran through the westerly portion of the township, roughly northeast to southwest from Hillsborough Township to Hopewell Township. The area zoned for business was a strip 300 feet wide on each side of the railroad right of way. It is of interest to note that throughout the evolution of the zoning ordinance, including the amendment now under attack, the planning for industrial growth has focused about the railroad.

Planning and zoning had been a matter of fairly constant study. In this connection the governing body used the services of The Government Consulting Service of the Institute of Local and State Government, University of Pennsylvania, for analysis of and recommended solutions to the various problems. In 1951, for example, a report from this Service to the planning board, under the heading "Planning and Policy Questions for Township Zoning," suggested avenues for study "designed to elicit significant information and judgments that will be reflected in the zoning plan." The suggestions related to "population, residential development, farming commerce, industry, transportation and public services." Continued attention to the

orderly as well as fruitful development of land use brought about a general revision of the zoning scheme in 1953. Appellants say in their brief that this change emanated from "two or three years of consultation and study by the municipal officials, during which period they had the professional assistance of the Government Consulting Service, Institute of Local and State Government, University of Pennsylvania." Five use districts were brought into being thereby: agricultural, rural residential, commercial, manufacturing (to be called hereafter, M zone) and limited industrial. Creation of the last-named district was declared invalid in *Kozesnik v. Montgomery Twp.*, 24 *N. J.* 154 (1957), but it has since been reestablished.

The original 600-foot strip divided by the railroad right of way was retained for manufacturing purposes. However, the M zone was extended by approximately 460 additional acres on one side of the tracks to the east and south from the northerly township line to County Road 13 S 1. The easterly boundaries then became U. S. Highway No. 206 and a brook called Cruser's Brook. On March 22, 1956, the zone was again enlarged by 40 acres to the southwest of County Road 13 S 1 and on the same side of the railroad.

The M zone did not bring industry in its wake, and on January 30, 1956 the planning board recommended to the township committee that an industrial commission be established. The suggestion was adopted by an ordinance introduced on February 23 and enacted on March 8, 1956. The record discloses that on February 18, 1956 a news item appeared in the *Plainfield Courier News* to the effect that the Minnesota Mining and Manufacturing Co. (referred to hereafter as 3 M) was contemplating the construction of a large manufacturing plant "valued at more than a million dollars." The tenor of the account was that negotiations were being conducted with Passaic Township to have it built there. The fact was that the Irvington Varnish and Insulator Co., a wholly owned 3 M subsidiary, was planning the project. The news article was brought to the attention of the township committee on March 6, 1956 by the mayor,

and the clerk was directed to make inquiries with respect to the possible location of the structure in Montgomery. Undoubtedly, the committee was aware that 3 M owned 56 acres in the portion of residential district lying generally west of both the railroad and the existing M zone.

The matter was referred to the planning board for study. The services of the Government Consulting Service were also enlisted. Members of the planning board and the township committee, as well as representatives of the industrial commission, visited the existing Irvington plant to study its operation and manufacturing processes. The factual data gathered in this fashion were submitted at a meeting of the planning board on April 2, 1956. Its members agreed that the proposed industry was a desirable one for the township and recommended that consideration be given to extending the M zone. At that meeting also, the industrial commission advised that its members agreed that industry was the solution of the high tax rate and would make for a "balance of industry, residences and farms." They reported also that by a 4–1 vote they favored allowing Irvington Varnish Co. to enter the municipality but that they made no recommendation as to zoning, believing that matter to be the function of the planning board and township committee. The written report of the Governmental Consulting Service, dated April 6, 1956, and submitted by the same consultant who had made the earlier studies, says among other things:

"During the past several months the Planning Board and the Government Consulting Service staff have been considering the necessity for increasing Township land area available for non-residential development. The result of this study was a recommendation to the Township Committee for amending the zoning ordinance to increase both the Manufacturing and the Commercial districts. The Township Committee has drawn the necessary ordinances, and has requested a formal report from the Planning Board. This memorandum is a review of the proposed zoning changes, including policy considerations of the Planning Board as well as technical considerations of the Governmental Consulting Service staff."

There follows an elaborate discussion of the proposed change in the M zone to include an additional 225 acres

therein, including the 56 acres of 3 M, the boundaries of the enlarged area and the reasons therefor, and the relation of the amendment to the comprehensive zone plan. Thereafter, on April 9 the planning board again convened. The formal report of the consultant was read and the proposed amendments to the zoning ordinance to accomplish the area increase of the M district were approved. On April 16 the township committee passed the amendatory ordinance on first reading. Final adoption followed on May 1, 1956 —1 month and 25 days after the information was received about the projected new Irvington Varnish Co. plant.

The plaintiffs challenge the validity of the ordinance, asserting (1) that the purpose of its enactment was to benefit one corporate land owner; (2) that it was not adopted in accordance with a comprehensive plan, and (3) that it constitutes an arbitrary, unreasonable and capricious exercise of the zoning power. The governing body defends its action as compatible with sound principles of zoning and as designed to advance the general welfare of the community.

The conclusion is inescapable that the township was hungry for tax revenue. Manifestly, its fiscal picture was such that a new source of income would serve the general economic welfare. Pursuit of that objective was entirely worthy of the attention of the municipal fathers. And its achievement through land use regulation will not warrant judicial condemnation as long as it represents an otherwise valid exercise of the statutory zoning authority. If the amendment of the ordinance is compatible with and furthers a legitimate comprehensive plan for the zoning of the municipality within the contemplation of the statute, *N. J. S. A.* 40:55–32, it is legally unobjectionable. The fact that increased tax revenue is intended to result therefrom, or that an individual property owner may be benefited incidentally does not justify a charge of perversion of power. *Kozesnik v. Montgomery Twp., supra; Collins v. Board of Adjustment of Margate City,* 3 *N. J.* 200 (1949); *Rockaway Estates v. Rockaway Tp.,* 38 *N. J. Super.* 468 (*App. Div.*

1955); *Greenway Homes v. Borough of River Edge,* 137
*N. J. L.* 453, 456 (*Sup. Ct.* 1948).

These considerations point the crucial question at
the amended ordinance. Is the enlargement of the M zone
accomplished thereby compatible with a comprehensive plan
for the orderly development of land use in the township?
Or does it represent a discordant and irrational note out
of harmony with such plan? A comprehensive plan has
been defined generally as an "integrated product of a
rational process" revealing a physical partition of the
municipality reasonably designed to produce a homogenous
pattern of location and uniform development of variant
land uses. The zoning ordinance itself may bespeak the
scheme; there need be no extrinsic guide. *Kozesnik v.
Montgomery Twp., supra.*

As has been indicated, the township was already
divided into five districts prior to the amendment in ques-
tion: agricultural, rural residential, commercial, manu-
facturing and limited industrial. The vast majority of the
entire land area had been placed in the agricultural zone.
The manufacturing district was localized in the north central
part of the township. The extension thereof by the amend-
ment under attack did not disturb the localization. The
light industrial section is just to the west of the M zone
with a corridor passing through the enlarged manufacturing
area to the railroad. So it may be said that the manu-
facturing and industrial uses have been confined to one
general locality. Inspection of the map attached to the
zoning ordinance reveals the broad outlines of an integrated
plan. Heed is paid to the predominantly agricultural
character of the land use; limited rural residential sections
are set out, probably representing the few areas where resi-
dence as such exists. All of these sections border on agri-
cultural zones where future development for home purposes
may be blended harmoniously. And finally, a design appears
to localize business uses. On the whole, the scheme which
speaks from the ordinance and map recognizes the proba-
bility that in the evolutionary spirit of the times the land

use has not reached maturity and yet gives consideration to the present paramount complexion of the use; and it prepares for the future by seeking and encouraging and yet controlling industrial and manufacturing occupancy. There is no requirement in the law that zoning be immutable, particularly in relatively undeveloped areas. It should look toward the future and be adaptable to changing conditions. The law requires only that at a given time the physical partitioning be reasonable and consonant with the broad objectives of *N. J. S. A.* 40:55-32.

 Prior to the 1956 amendment, manufacturing was allocated to the easterly side of the Reading Railroad right of way and for a distance of 300 feet on the westerly side. The 225 acres added by the amendment being discussed were all immediately to the west of and adjoining the portion of the railroad right of way which is south of Cruser's Brook. Thus it is noticeable that the new section is within the general area reasonably available for additional manufacturing and industrial use and entirely consistent with the physical partition plan evidenced by the map. Moreover, the newly included tract appears to have reasonable boundaries and business access advantages; on the west is County Road 13; on the east lies the railroad; on the south a line which runs from the terminal point of the existing M zone east of the railroad to County Road 13. It was pointed out also that County Road 13 and the railroad cross each other about 3,500 feet from this line, and the area between the two gradually narrows to the apex of the triangle where they intersect, thus tending toward lessening utility for manufacturing plant purposes. The westerly limit is marked by a natural boundary, Cruser's Brook. Considerable criticism is leveled at the use of this brook. However, it cannot escape attention that the brook proceeds under the railroad tracks and constitutes the southerly boundary of the already existing manufacturing zone out to the point where it intersects U. S. Highway 206, which marks the most easterly portion of the boundary. Geographically, therefore, the newly included area is well integrated with

the existing zone. Choice of these northerly and southerly lines is alleged to be arbitrary because the same type of property is on both sides of the boundaries. But the decision to establish the physical limits of a district is a matter of legislative judgment. As was said in *Kozesnik v. Montgomery Twp., supra,* 24 *N. J.* at *page* 172:

"[L]ines must be drawn somewhere, and it may well happen, especially in rural areas, that little will distinguish properties on both sides of a given line. The final test must be whether the municipality is seeking to advance the community interest rather than some private or sectional advantage. *Raskin v. Town of Morristown,* 21 *N. J.* 180 (1956)."

The overall purpose of the township committee and the factors set forth as influencing the selection of the boundaries clearly stand in the way of a judicial decision that no rational basis can be found in support of them.

The comment of the Government Consulting Service with respect to the desirability of including the new area in the M zone is worthy of quotation:

"2. Physical characteristics of the area to be added to the M district are satisfactory for industrial use.

(a) Topography is good. The land is flat enough for development without extensive regrading, and there is enough grade for good drainage.

(b) Although the Railroad is in a cut through part of the area and on an embankment in part of the area, it would be possible to serve all parts of the area with railroad spurs at acceptable grades. (Access to the Railroad is actually better in the proposed M area than it is in much of the area presently zoned for manufacturing.)"

Although the record is not entirely clear on the subject, it appears that the 225 acres newly incorporated in the zone contain only five or six scattered homes. These homes are constituted conforming uses in the amended district. No new construction has taken place there since 1946. The consultant's report suggests that the purpose of enlarging the zone by 225 acres was to guide future development as well as to forecast it.

Enactment of the amended ordinance was attended with a presumption of validity. In attacking it, plaintiffs must assume the burden of showing clearly that it is arbitrary or unreasonable. In the absence of proof of such quality, the judiciary cannot interfere with the policy determination of the municipal body. *Kozesnik v. Montgomery Twp., supra,* 24 *N. J.* at *page* 167. Moreover, if the problem of conformity with the requirements of the zoning statute is reasonably debatable, the duty of the court is to affirm. *Hochberg v. Borough of Freehold,* 40 *N. J. Super.* 276 (*App. Div.* 1956), certification denied 22 *N. J.* 223 (1956).

In our judgment, examination of the testimony adduced concerning the entire M zone in its amended and enlarged form, particularly in relation to the location of the railroad, does not indicate such lack of harmonious integration with the zoning pattern of the Township as to warrant a finding of arbitrary or capricious action. It is true that the governing body acted quickly to study and bring about the inclusion of the additional 225 acres and specifically the 56 acres of 3 M into the manufacturing district. These factors excite suspicion, but under the circumstances disclosed by the proof are not sufficient to overcome the presumption of validity of the action taken nor to demonstrate disregard of the general welfare as it is associated with zoning according to a comprehensive plan.

The judgment is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS and PROCTOR—5.

*For reversal*—Justices HEHER and WACHENFELD—2.