79 N.J. Super. 327 (1963)
191 A.2d 501
PALISADES PROPERTIES, INC., A DELAWARE CORPORATION AUTHORIZED TO DO BUSINESS IN THE STATE OF NEW JERSEY, PLAINTIFF,
v.
GEORGE H. BRADY AND KATHERINE P. BRADY, HIS WIFE, JOSEPH J. BRUNETTI CONSTRUCTION CO., A CORPORATION OF THE STATE OF NEW JERSEY, BOROUGH OF FORT LEE, NEW JERSEY, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, JERSEY PALISADES LAND COMPANY, A NEW JERSEY CORPORATION, PETRO KATKO AND MARY JAHOCK AND PALISADES INTERSTATE PARK COMMISSION, A BODY CORPORATE AND POLITIC ESTABLISHED BY COMPACT BETWEEN THE STATES OF NEW YORK AND NEW JERSEY, DEFENDANTS. SEALANTIC FUND, INC., A MEMBERSHIP CORPORATION OF THE STATE OF NEW YORK, PLAINTIFF,
v.
PALISADES PROPERTIES, INC., A DELAWARE CORPORATION, AND THE BOROUGH OF FORT LEE, NEW JERSEY, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided May 27, 1963.
*334 Messrs. Gassert, Murphy & Gassert for plaintiff Palisades Properties, Inc. (Messrs. O'Mara, Schumann, Davis & Lynch, by Mr. Joseph A. Davis, of counsel; James Dorment, Jr., on the brief).
Mr. William V. Breslin for defendant Borough of Fort Lee.
Mr. Arthur J. Sills, Attorney General of New Jersey (Mr. Robert B. Kroner, Deputy Attorney General, appearing), for defendant Palisades Interstate Park Commission.
Messrs. Shanley & Fisher (Mr. Bernard Shanley appearing), for plaintiff Sealantic Fund, Inc.
PASHMAN, J.S.C.
This consolidated action involves a dispute over the use of a tract of land which is located just south of the George Washington Bridge in the Borough of Fort Lee. Because of the complexities of the legal issues presented it is necessary, in limine, to relate in some detail the factual background which spawned the present controversy. The limited stipulation of facts agreed upon by the parties serves as a convenient beginning point in this regard.
*335 In April 1927 the Borough Council of Fort Lee approved, by resolution, a map entitled "Map of Hudson Bridge Park Estates," which included a tract of land (herein the Estates) situated south of the George Washington Bridge and on the top of the geographic area known as the Palisades.
Directly to the south of this tract are lands now owned by the Palisades Interstate Park Commission (herein the Commission), which had been, in large part, the site of a Revolutionary War fortification. The Commission's acquisition of this property was in furtherance of a plan to restore the fortification as part of a recreational park and to help preserve the scenic integrity of the entire Palisades.
In acquiring much of its property the Commission received considerable aid in the form of substantial philanthropic contributions from John D. Rockefeller, Jr., who, by the mid-1930's had donated over 652 acres of land to the Commission at a cost in excess of 19 million dollars.
In 1952 a proposal was made to erect a multi-story apartment house development in Fort Lee within the Estates tract. The Commission, upon learning of this proposal, and in order to block the erection of the apartment houses, offered to purchase the lots owned by the borough in the Estates. Negotiations ensued and the Commission enlisted the aid of Sealantic Fund, Inc. (herein Sealantic), a charitable corporation of the State of New York founded by John D. Rockefeller, Jr.
A plan was then devised whereby the Estates area was divided into two parcels, "A" (the western half of the Estates) and "B" (the eastern half of the Estates), Parcel "B" going to the Commission and Parcel "A" to be disposed of by Sealantic for commercial development subject, however, to certain height and sign restrictions.
In December 1953 Sealantic offered to purchase all of the lots owned by the borough (137 out of 195) for $250,000. The offer was subsequently accepted. Thereafter, a dispute arose as to the necessity, advisability and validity of the *336 transaction, and prolonged litigation ensued in the federal courts. While the exact nature of that controversy is not particularly relevant to the matter presently before the court, suffice it to say that the conflict arose, in part, out of the borough's concern over loss of ratables and a desired modification of certain height restrictions.
In June 1956 a compromise solution was agreed upon and effectuated by the litigants in the federal court action. The transactions which resulted from the agreement and which form the core of the instant litigation are as follows:
(1) The borough executed and delivered a deed to Sealantic conveying a total of 137 lots for the sum of $300,000;
(2) The borough executed and delivered a deed to Sealantic conveying 12 additional lots;
(3) Sealantic agreed to convey to the borough all of the property owned by or to be conveyed to it in Parcel "A," together with 10 additional lots which it had previously acquired;
(4) Sealantic agreed to convey to the Commission, without consideration, 74 lots in Parcel "B."
As a result of the consummation of the transactions above described, Sealantic divested itself of all property ownership in the Estates. However, the deed from Sealantic to the borough contained the following restrictions:
"The within described property is conveyed with the following restrictions which shall run with the land:
The Grantee as part of the consideration for this conveyance hereby covenants and agrees for itself, its successors and assigns with the Grantor, its successors and assigns, for the benefit of the property conveyed to the Grantor by deed bearing even date herewith and adjoining the premises hereby conveyed on the east:
1. That no building, improvement or structure of any kind or character whatsoever shall ever be constructed or maintained on the premises hereby conveyed or on the premises described in paragraph 3 below or on any part of either thereof which shall extend in height above a horizontal plane at an elevation of 320 feet above mean sea level at the George Washington Bridge:
2. That no structure consisting of a sign, display or similar device, whether illuminated or not illuminated, shall ever be constructed or *337 maintained on, above or east of the easterly wall of any building, improvement or other structure which may at any time be erected on the premises hereby conveyed or on the premises described in paragraph 3 below or on any part of either thereof and that during any period of time, no building improvement or structure (other than a sign, display or similar device) is erected or maintained on said premises or on any part thereof, no such sign, display or similar device shall ever be constructed or maintained on the premises hereby conveyed or on the premises described in paragraph 3 below or on any part of either thereof east of a line drawn parallel to and distance 100 feet easterly from Hudson Terrace, as now laid out.
3. The premises in addition to the premises hereby conveyed on which the restrictions set forth in the foregoing paragraph 1 and 2 are imposed by the Grantee are identified as:
Lots 3, 16, 18, 20, 38 and 40, Block 2; Lot 8, Block 4; Lots 8 and 21, Block 1; and Lots 1, 8, 10, 13, 14 and 16, Block 3, all as shown on a certain map entitled: `Map of Hudson Bridge Park Estates, Fort Lee Borough, Bergen Co., N.J.' filed in the Bergen County Clerk's Office on May 11, 1927, as Map No. 2262."
Simultaneous with the execution and delivery of the deeds, the borough executed a separate instrument, captioned Declaration of Restrictions and Covenants," by which it, in effect, iterated the restrictions and covenants contained in the deed from Sealantic.
The afore-mentioned height and sign restrictions were imposed by the conveyance and the "Declaration" upon 15 lots within the Estates, title to which was in the borough from the outset and at no time in Sealantic. Thus, following the 1956 transactions, the borough owned 100 lots in the Estates upon which height and sign restrictions were imposed. Sealantic, in return, was content in the knowledge that its avowed purpose of preserving the scenic beauty of the Palisades was protected through the restrictions imposed upon the lots in Parcel "A."
The next matter of any consequence occurred on March 18, 1959, when, following a duly advertised offer, 96 of the 100 lots owned by the borough were sold to an agent of Palisades Properties, Inc. (herein Properties) for $128,500. The other four lots owned by the borough were sold to the Port of New York Authority and are not involved in this action.
*338 At the time of the 1956 agreement between Sealantic and Fort Lee, and at the time of the March 1959 sale, these 96 lots were in an "R-4" zoning district which limited buildings to 35 feet or 2 1/2 stories in height. In April 1959 the borough's zoning ordinance was amended, pursuant to an express condition in the offer of sale, changing the zoning district to "C-3" and thereby increasing the height limitation to 96 feet or 8 stories.
After Properties purchased the 96 lots from the borough it then proceeded to obtain the only privately held lots in the Estates (13 in number)  none of which was expressly subject to the 1956 height and sign restrictions. In May 1961 Properties also sought and obtained from the borough a vacation of two paper streets in the Estates area, viz. Cliff Avenue and Old Fort Boulevard. Properties' avowed purpose in purchasing the lots in question and in seeking a vacation of the paper streets which abutted thereon was to allow it ample space upon which to construct a motor hotel.
It is undisputed that as early as 1957, inquiries had been made by Properties' parent affiliate, Marriot Motor Hotels, Inc., of both the Commission and Sealantic regarding a possible waiver of the height and sign restrictions. This approach was taken because Properties contemplated the erection of a tower, as part of its overall motel complex, which would exceed the applicable height restriction. Since the Sealantic-Fort Lee agreement was consummated in the context of height restrictions and an intention to maintain the scenic beauty of the Palisades area, the attempts by Properties to obtain some sort of waiver were to no avail. However, the testimony and exhibits did indicate certain discussions which tended to reflect a willingness on Sealantic's part to raise the restrictions to 354 feet.
In July 1962, after negotiations had failed, Properties filed an application for a building permit. The filed plans for its proposed motel complex revealed that it would be located up on the lots expressly restricted by Sealantic originally, upon the lots acquired by Properties from private persons, and *339 upon the vacated streets. None of the structures depicted on the plans filed by Properties exceeded the 320-foot height restriction imposed by the Sealantic-Fort Lee agreement of 1956.
Prior thereto, in January 1962, Properties instituted an action to quiet title to its property, asking the court to determine the extent and scope of the 1956 restrictions. This suit was prompted by the prior course of negotiations between Properties, the Commission and Sealantic, and their failure to arrive at a satisfactory solution. The major points of conflict revolved about the scope of the restrictions insofar as the privately purchased lots were concerned, the legality of the vacation of Cliff Avenue and Old Fort Boulevard, and the validity of the 1959 amendment to the Fort Lee zoning ordinance. The major contestants were Properties and the Commission. Fort Lee assumed a neutral position, and several other named defendants were merely concerned with the effect of the street vacations upon their rights of ingress and egress.
Four months later Sealantic filed a separate action setting forth much of the background previously discussed and charging Properties and the borough with a scheme to circumvent the 1956 Sealantic-Fort Lee agreements. More specifically, Sealantic alleged that Properties' plan to erect a multistory tower upon that portion of their property which was acquired from private owners and the street vacations would, if effectuated, substantially impair the scenic beauty and natural skyline of the Palisades and thereby deprive Sealantic of its rights bargained for under the 1956 agreement with Fort Lee. Sealantic demanded, inter alia: (a) a permanent injunction against violation of the height and sign restrictions on land expressly covered by the 1956 agreement; (b) a permanent injunction against the use of specifically restricted lands in connection with a use of other lands violating the restrictions; (c) a declaration that the restrictions applied to all properties formerly within the control of Fort Lee, including the vacated paper streets; (e) a decree setting aside the actions *340 of Fort Lee in amending its zoning ordinances and vacating its streets to permit the erection of edifices which would violate the restrictions; (f) a permanent injunction restraining and enjoining Fort Lee from doing any other affirmative act so as to permit such violations; and (g) reformation of the 1956 agreements and deed so as to "set forth the true intent of the parties" thereto, and enjoining any violation of the agreements and deed as reformed.
Properties' answer, while denying the allegations of inequitable conduct, stated that "it admits that this defendant hopes to erect a structure on its unrestricted property which will be of a height in excess of the restrictions" set forth in the 1956 agreements between Sealantic and Fort Lee (emphasis added).
After the cases were consolidated and the issues joined, Properties, as noted earlier, filed its plans and sought a building permit. Thereafter, on August 8, 1962 this court signed a temporary restraining order enjoining the borough and its building inspector from approving or issuing a builder's permit or other official approval for excavation, construction or other building activity upon the property in question.
On August 24, 1962 Properties was enjoined pendente lite from further applying for or taking any action seeking approval of a building permit or other official approval concerning building activity upon the property described in their July application, and Fort Lee and its building inspector were enjoined from issuing any such approval. A motion to vacate the restraints was subsequently denied and the matter proceeded to trial.
Before embarking upon a consideration of the legal issues in this case one additional observation is necessary. While the present plans submitted by Properties do not contemplate the erection of any structure in excess of the 320 foot height and sign restrictions, all counsel have agreed, as reflected by the pretrial order in this matter, that the court should dispose of the propriety not only of the present building plans, but future plans as well, with a view to avoiding a succession of *341 actions arising from the filing of new plans. To this end, the court will assume that Properties intends to erect a structure upon its privately acquired lots which, if located upon the lots conveyed by Sealantic to Fort Lee, would admittedly be in violation of the height and sign restrictions.
Sealantic argues that in considering the critical events in question, the legality or validity of each should be approached in a manner most favorable to it because of the total disregard by Properties and Fort Lee of basic and elemental notions of justice and fair play. While the thrust of this contention is completely appreciated by the court, the mere juxtaposition of the litigants (a charitable corporation and a state agency against a private corporation for profit and a self-interested municipality) will not per se serve as a source from which more beneficent standards will be accorded the former because of their inherent public-spirited nature.
The first issue before the court concerns the scope, nature and legal effect of the restrictions contained in the deed, declaration of restrictions, contract and agreement between Sealantic and Fort Lee. Initially, it must be conceded that the scope and nature of the restrictions are, at least, as extensive as their literal language reveals. That is, on the lots actually conveyed by Sealantic to the borough, and the 15 borough-owned lots expressly encompassed by the language of the restriction, no structure, building or improvement of any kind or character whatsoever may be constructed or maintained which shall extend in height above a horizontal plane at an elevation of 320 feet above mean sea level at the George Washington Bridge. Nor shall any sign, display or similar device, illuminated or not illuminated, be constructed or maintained in violation of the restrictions imposed.
More important, and perhaps the crucial question in this case, is whether the restrictions contained in the Sealantic-Fort Lee agreement may be imposed upon the privately acquired lots and the areas of the vacated streets which reverted to Properties.
*342 An examination of the map of Estates and the building plans filed by Properties reveals that the so-called "economic hub" of the proposed motel complex will be situated, in part, upon the lots which had been privately owned at one time and upon the vacated section of Cliff Avenue. Sealantic, conceding that these lots are not expressly subject to the restrictions in question, seeks to justify its assertion that they are also subject to the 320 foot height restriction on the basis of a novel two-pronged argument. In essence, it contends that (a) the entire motel complex is an economic unit and, therefore, the erection of a tower on the "unrestricted" portion as an incident to a use forbidden on the restricted portion, is, itself, a violation of the restrictions; and (b) the entire motel complex is a single "integrated facility" and mere physical separation of the structures should not be used as a facade to completely undermine the thrust and effect of the restrictions imposed upon adjoining portions of the same property and the same facility.
If this argument is sustained, the points of attack advanced by Sealantic upon the alleged inequitable municipal action concerning the sale to Properties, the zoning amendment and the street vacations will become minor elements. Consequently, these issues must necessarily be deferred. Similarly, whether the 1956 agreements, deed and "Declaration" must be reformed also depends upon the effect of the major argument advanced.
There is no doubt that the use of property restricted by covenants or zoning laws as an "incident to a forbidden use" of property not so restricted, is the equivalent of a violation of the particular restriction. For example, in Laughlin v. Wagner, 146 Tenn. 647, 244 S.W. 475 (Sup. Ct. 1922) the court held that land restricted to residential use could not be utilized as a means of ingress and egress to a commercial establishment on adjacent unrestricted property. To permit this would be an implicit violation of the express intent manifested by the restriction and entirely beyond that which might be characterized as "reasonably incident to its use for residential *343 purposes * * *." 244 S.W., at p. 478. Similarly, where a driveway traversed property restricted to residential use and terminated upon adjacent cemetery property, it was held that an injunction could issue to restrain that manner of use of the driveway, since otherwise "it would be tantamount to dedicating the four acre tract [the restricted property] to a prohibited business or commercial purpose [the cemetery]." Starmount Co. v. Greensboro Memorial Park, 233 N.C. 613, 65 S.E.2d 134, 137, 25 A.L.R.2d 898 (Sup. Ct. 1951). See also Town of Brookline v. Co-Ray Realty Co., 326 Mass. 206, 93 N.E.2d 581 (Sup. Jud. Ct. 1950) and compare with Frank J. Durkin Lumber Co. v. Fitzsimmons, 106 N.J.L. 183 (E. & A. 1929).
Relying upon the tenor and import of the foregoing decisions, Sealantic maintains that they demonstrate a salutary, equitable proposition to the effect that restricted property does not exist in a vacuum; that if a "prohibited" use, albeit on adjacent unrestricted land, disrupts the harmonious application of the restriction to the land expressly restricted, the former may and should be proscribed. The argument, as applied to the facts sub judice, is not dispositive for a combination of reasons. Initially, the restrictive covenants relied upon by Sealantic are, like any other, the written manifestation of contractual intent and so subject to a strict, not liberal, construction. See, e.g., Fortesque v. Carroll, 76 N.J. Eq. 583 (E. & A. 1910); Howland v. Andrus, 81 N.J. Eq. 175 (E. & A. 1913); Ritter v. Jersey City Dist. Missionary Soc., 105 N.J. Eq. 122 (Ch. 1929); Majeski v. Stuyvesant Homes, Inc., 140 N.J. Eq. 460 (Ch. 1947). Of course, construction of restrictive covenants, especially by a court of equity, should be realistic in light of the context in which they were created, Javna v. D.J. Fredericks, Inc., 41 N.J. Super. 353, 358 (App. Div. 1956), and the court should be cognizant of the mutual intent and purpose of the parties creating them. See, e.g., Caullett v. Stanley Stilwell & Sons, Inc., 67 N.J. Super. 111, 115 (App. Div. 1961). Consequently, in determining the scope of the restrictions involved in this case the burden *344 was upon Sealantic to prove the legal soundness of its interpretation. The fact that its purpose was to foster historical and aesthetic considerations, however admirable, deserves no undue weight.
Properties argues that there is a distinction between a functional use restriction and a mere structural restriction, concluding that the restrictions in this case fall in the latter category and, therefore, are an entirely unwarranted basis for applying the ratio decidendi of the Laughlin and Starmount cases, supra. In essence, its argument is simply that the 320-foot height restriction is declarative of an intent to forbid a structural violation, not a use or function of the edifice itself, and that Sealantic's admitted purpose in seeking to preserve the scenic beauty of the Palisades and the integrity of its skyline merely buttresses this interpretation. The point is well-taken from an analytical standpoint. Unlike the cases cited by Sealantic, the use involved sub judice, i.e., a large motel complex, is permissible on any portion of the lands. If Properties intended to build its entire motel complex on the expressly restricted lots, there could be no complaint forthcoming so long as there was no height or sign violation. The functional use which was housed therein would be entirely irrelevant to the restrictions as written.
Sealantic contends, however, that its argument in no way distorts the conclusion reached above. Rather, it is the incident  the conjunction between the 320+ foot edifice and the rest of the motel complex  which is the fatal element, not merely that such a tower may house the "economic hub" of the project. The court cannot agree with this conclusion. The fallacy lies in the theory that the said conjunction, ipso facto, carries with it the restriction. This is true if, but only if, the language of the restrictions, in light of all the surrounding circumstances, reasonably lends itself to such a construction and, in addition, the essential attribute of the allegedly interdicted entity (be it of a structural or functional nature) cannot be separated from the whole. The four corners of the land mass upon which the restrictions are imposed *345 is the critical area upon which the judicial attention should be focused. Properties argues that the court must be alert to the hidden circuity which Sealantic's contention inherently contains. That is, in stating the proposition, the starting point must be the area upon which express restrictions are imposed; next, the thrust of the restriction is urged to include an area not expressly restricted, and, finally, the borders are obliterated and the physical division completely subordinated. This result may be entirely correct, but only if one vital premise is substantiated, namely, that the language used supports the conclusion.
The flaw in Sealantic's argument is not that its thesis is equitably unwarranted; quite the contrary. A commercial structure which pierces the natural skyline of an area whose scenic integrity has been actively preserved is aesthetically deplorable. Moreover, where an active attempt has been made to guard against just such a condition, equity should be hesitant in condoning undue circumvention of that salutary purpose. Nevertheless, this court should not, and indeed cannot, characterize the circumstances sub judice in those terms. "[I]ncursions on the use of property will not be enforced unless their meaning is clear and free from doubt * * *." Caullett v. Stanley Stilwell & Sons, Inc., supra. Therein lies the basis for this determination. The language of the 1956 agreement is clear and unambiguous. The phrase "premises hereby conveyed or on the premises described in paragraph 3 below or on any part of either thereof" means just what it says, and no more. Lots 51, 52, 53 and 54 in Block 2 of Estates (privately owned) were not included, and any attempt to encompass them within the quoted language cannot be justified. These lots were not then, nor have they ever been, subject to the imposition of contractual restrictions agreed upon between Sealantic, the Commission or Fort Lee. Fort Lee could not agree, by contract with Sealantic, to restrict private property owners in the use and manner to which they might utilize their property, however beneficial it might be to the preservation of the integrity of the Palisades. *346 Cf. Houston Petroleum Co. v. Automotive Products Credit Ass'n. 9 N.J. 122, 129-130 (1952); Beckmann v. Teaneck Township, 6 N.J. 530, 535 (1951). Neither the "incident to a use" or "integrated facility" theories advanced by Sealantic can be sustained in view of the express, unambiguous language of the instruments relied upon, nor the distinction between the facts sub judice and those involved in such cases as Laughlin, Starmount and Town of Brookline, supra. Nor does the concededly noble purpose intended by Sealantic serve to override private property rights entitled to equal consideration.
Sealantic also attacks the conduct of the Borough of Fort Lee alleging that it violated the terms of the mutually acknowledged "true intent" of the 1956 agreements. In short, that the cumulative effect of the 1959 zoning amendment, the 1959 public sale to Properties and the 1961 street vacations, when viewed in the light of the 1956 agreements and the events spawning them, are said to expose a course of bad faith on the part of Fort Lee, lacking in common fairness and justice, and intended to frustrate the prime objective expressly and implicitly recognized in the execution of the 1956 agreements.
Certainly, principles of fairness may bind municipalities equally with private persons. Any doubt as to the validity of this principle was interred by our Supreme Court in the recent case of Gruber v. Mayor, etc., of Raritan Tp., 39 N.J. 1, 13 (1962), which held, in part, that equitable principles of estoppel against municipalities may be applied "where the interests of justice, morality and common fairness clearly dictate that course." The overriding presence of these distinctly equitable factors justifies the application of the estoppel doctrine despite the general rule which looks with disfavor upon such a step. See Pennyton Homes, Inc. v. Planning Bd. of Stanhope, 78 N.J. Super. 588, 597 (App. Div. 1963).
The undisputed testimony of Sealantic's witnesses, including that of Mr. Laurance Rockefeller, the son of the *347 primary benefactor of the Palisades project, amply demonstrated the substantial amount of time, money and effort which, since the late 19th Century, has been devoted to the establishment and preservation of the Palisades. See L. 1896, c. 23, p. 47; L. 1899, J.R. #1, p. 170; L. 1900, c. 87, (now N.J.S.A. 32:14-1 et seq.) Furthermore, there can be no doubt that Fort Lee knew of Sealantic's primary concern in negotiating and consummating the 1956 agreements. But was there an integral unwritten agreement binding Fort Lee to do all within its legal power to promote the understanding and purposes of the agreement and refrain from or actively prevent the desecration of the Palisades skyline? I am compelled to conclude that there was not. Obviously, Fort Lee knew of Sealantic's purpose; indeed, the very result of the 1956 agreement whereby Sealantic divested itself entirely of Estates ownership presupposes that knowledge. On the other hand, as has been stated earlier, Fort Lee could not abdicate its governmental powers merely on the basis that to do so would promote a noble purpose. A recognition of the manifold considerations which affect municipal actions belies the conclusion urged by Sealantic. The fact is that the language of the 1956 agreement speaks for itself and the court cannot read into it that which is not contained therein. It is presumed that the final memoralization embodied the full scope of the parties' mutual intent. Unfortunately for Sealantic, a number of lots existed in Parcel "A" which were owned by neither it nor Fort Lee. Sealantic surely knew this, for the ten parcels it purchased in the western portion of the Estates in 1952-53 were concededly "so spaced territorially as to effectually prevent any large-scale development from encroaching on the skyline of the Palisades." Sealantic might have demanded from Fort Lee a contingent restriction upon these privately-owned lots in the event of their after-acquisition. See Hammett v. Rosensohn, 46 N.J. Super. 527, 536 (App. Div. 1957). It simply did not do so. Failing this, Sealantic now seeks to accomplish the same result by charging Fort Lee and Properties with bad faith. As authority for *348 this proposition the case of Ward v. City of New Rochelle, 20 Misc.2d 122, 197 N.Y.S.2d 64 (Sup. Ct. 1959), affirmed 9 App. Div.2d 911, 197 N.Y.S.2d 128 (App. Div. 1959), motion for leave to appeal denied 7 N.Y.2d 1026, 200 N.Y.S.2d 68, 166 N.E.2d 859 (Ct. App. 1960), is strongly urged.
In Ward plaintiff had donated 13 acres of land to the New Rochelle board of education with the understanding that she would be free to develop the remainder of her property in accordance with the then existing zoning ordinance. Soon thereafter the ordinance was amended, resulting in a substantial curtailment of her development plans. The trial court held that since the plaintiff had irretrievably parted with land of great value, with no chance of receiving it back, she acquired a vested right to proceed with her development as contemplated. Said the court:
"Recognizing all the frailties in the case, it is still one where equity should protect the rights of the plaintiff, not by setting aside the zoning amendment adopted by the City as wholly invalid, but by holding it not applicable to the plaintiff's property. * * * If the amendment were held applicable to [her] property, a great injustice would be done to one who had dealt most generously with her community by depriving her of the just consideration contemplated by all parties at the time she made her gift. As the late Justice Carswell said in Lowe v. City of New York, 240 App. Div. 484, at page 489, 270 N.Y.S. 216, at page 221, affirmed 265 N.Y. 583, 193 N.E. 331 `Courts should not be astute to enable a municipal corporation to disavow its just commitments or obligations, or to conduct itself respecting them in a manner violative of fair dealing, which they would not sanction were natural persons the parties involved.'" 197 N.Y.S.2d, at p. 73.
This approach is concededly laudable. Nevertheless, the rationale espoused therein does have its limits. Where, as here, it is doubtful that Sealantic could have extracted a promise from Fort Lee concerning municipal regulation of the lots owned by neither, and where it is doubtful that such a provision would even be enforceable, to say that Fort Lee acted in bad faith in not doing all within its power to prevent subversion of Sealantic's desire is without merit.
*349 There is a significant difference between an attempt to disavow a commitment which a municipality may validly be compelled to carry out, and an attempt to foist upon a municipality a duty which it never purported to assume. Compare, e.g., Gruber v. Mayor, etc. of Raritan Tp., supra, 39 N.J., at pp. 18-19, and Johnson v. Hospital Service Plan of N.J., 25 N.J. 134, 143-144 (1957). In its argument concerning the elements of equitable relief, i.e., reason, justice and fair play, and its attempt to apply them to Fort Lee and Properties' conduct, Sealantic is asking for more than this court can give it under the circumstances.
Having disposed of the contention that the over-all conduct of Fort Lee and Properties violates the equitable elements imposed by common fairness, there remains for consideration the validity of the particular actions taken, namely, the amendment to the zoning ordinance, the sale to Properties, and the vacations of Cliff Avenue and Old Fort Boulevard.

THE 1959 AMENDMENT
Prior to April 1959 the Estates were in an "R-4" zoning district which limited structures to 35 feet or 2 1/2 stories. On April 15, 1959 the area was rezoned to "C-3," which consequently raised the height restrictions to 96 feet or 8 stories. Sealantic attacks the amendment as (a) failing to bear a relation to a comprehensive plan, (b) enacted to serve purely private interests, and (c) evincing a disregard for the effect it has upon neighboring areas.
In immediate reply, Properties urges that the attack upon the amendment (as well as the public sale and street vacations) is untimely since it utterly fails to meet the requisites of R.R. 4:88-15(a) and (b) which place a 45 day time limitation on the right to seek prerogative writ review in this context. See, e.g., Gammond v. Livingston Tp., 53 N.J. Super. 449 (Law Div. 1958). Attention is also directed to Duke Power Co. v. Patten, 20 N.J. 42, 51-52 (1955), and Home Builders Ass'n of Northern N.J. v. Paramus, 7 N.J. 335, 342 (1951).
*350 This argument can be disposed of upon the ground that in the "interests of justice," as well as the novel and important questions raised in this litigation, the contentions of improper conduct are timely. Similarly, while Sealantic is not a resident or taxpayer of Fort Lee it should, under the circumstances, be permitted to advance the argument that the municipal action was detrimental to the public welfare. See Greenberg v. Fornicola, 37 N.J. 1, 4-5 (1962); R.R. 4:88-15(c).
Two further preliminary observations are in order before the merits of the particular issue are considered. First and foremost, "our Constitution commands that all laws concerning local government, and zoning laws are in that class, be construed liberally in favor of municipal power. N.J. Const. Art. IV, Sec. VII, par. 11." Vickers v. Township Com. of Gloucester Tp., 37 N.J. 232, 241 (1962). Cf. Monmouth Lumber Co. v. Ocean Township, 9 N.J. 64, 71 (1952). Secondly, judicial review of such actions is narrowly circumscribed; that is:
"The court cannot pass upon the wisdom or unwisdom of an ordinance, but may act only if the presumption in favor of the validity of the ordinance is overcome by an affirmative showing that it is unreasonable or arbitrary."
Vickers v. Township Com. of Gloucester Tp., supra, 37 N.J., at p. 242. See also Kozesnik v. Montgomery Twp., 24 N.J. 154, 167 (1957).
While these two criteria have been subjected to sharp criticism because of the "perfunctory manner in which they have come to be applied," Vickers v. Township Com. of Gloucester Tp., supra, 37 N.J., at p. 258 (dissenting opinion of Hall, J.), they nonetheless must be given their due. Therefore, in scrutinizing the actions of Fort Lee, the ordinances of that municipality must be given the benefit of all doubts.
Sealantic urges that the rezoning was not in consonance with a comprehensive plan; rather, it was intended to benefit Properties and was distinctly tailored to that end. Sealantic *351 points to the fact that in 1953 a private consulting firm retained by Fort Lee recommended, after a comprehensive study, that the area be developed for recreational purposes or, if apartments and commercial buildings were necessary or desirable, that a 320-foot height restriction be imposed. This being so, Sealantic concludes that the 1959 amendment effectuated the single purpose of relieving Properties of a restriction which was imposed for the common good. In short, it is alleged that the amendment was enacted for the benefit of Properties alone.
In Kozesnik v. Montgomery Twp., supra, the court made several critical observations as to the meaning of a "comprehensive plan." To begin with, any "comprehensive plan embraced by an original zoning ordinance is of course mutable." 24 N.J., at p. 167. So long as the amended ordinance reveals a rational plan, "it is of no moment that the new plan so revealed differs from the original one." Ibid. In the end, however, "[t]he final test must be whether the municipality is seeking to advance the community interest rather than some private or sectional advantage." Ibid., at p. 172. Cf. Raskin v. Morristown, 21 N.J. 180 (1956). Additionally, the mere coincidence of a furtherance of private interests is not itself conclusive on the question of validity, since
"If the purpose is solely to serve the private interests of the owner, there is a perversion of power, but if the intention is to further the welfare of the entire municipality as part of a comprehensive plan * * *, it is of no moment that private interests are simultaneously benefited." Kozesnik v. Montgomery Twp., supra, 24 N.J., at p. 173. (Emphasis added)
The borough, in its brief, candidly admits that the rezoning was designed to permit Properties to erect a commercial motel. For Fort Lee the attraction of Properties was, in part, a matter of survival, for a great loss of tax ratables had been suffered through the loss of municipal property to the Commission, the State of New Jersey and the Port of New York Authority.
*352 In Ward v. Montgomery Tp., 28 N.J. 529 (1959), the municipality amended its zoning ordinance by enlarging a manufacturing zone. The clear purpose was to attract industrial ratables to a predominantly rural town. Plaintiffs challenged the amendment on three grounds: (1) it was for the benefit of one corporate land owner; (2) it was not adopted in accordance with a comprehensive plan, and (3) it was arbitrary, unreasonable and capricious. The Supreme Court upheld the validity of the ordinance, stating:
"The conclusion is inescapable that the township was hungry for tax revenue. Manifestly, its fiscal picture was such that a new source of income would serve the general economic welfare. Pursuit of that objective was entirely worthy of the attention of the municipal fathers. And its achievement through land use regulation will not warrant judicial condemnation as long as it represents an otherwise valid exercise of the statutory zoning authority. If the amendment of the ordinance is compatible with and furthers a legitimate comprehensive plan for the zoning of the municipality within the contemplation of the statute, N.J.S.A. 40:55-32, it is legally unobjectionable. The fact that increased tax revenue is intended to result therefrom, or that an individual property owner may be benefited incidentally does not justify a charge of perversion of power." 28 N.J., at p. 535. (Emphasis added)
See Gruber v. Mayor etc. of Raritan Tp., supra, 39 N.J., at pp. 9-11.
If the change represents a discordant and irrational note and is out of harmony with a comprehensive plan, then, and only then, should the court intervene and strike down the ordinance.
The phrase "comprehensive plan," which has been mentioned throughout the preceding discussion, was defined by Chief Justice (then Justice) Weintraub in the Kozesnik case, supra, in the following way:
"`[P]lan' connotes an integrated product of a rational process and `comprehensive' requires something beyond a piecemeal approach, both to be revealed by the ordinance considered in relation to the physical facts and the purposes authorized by R.S. 40:55-32." 24 N.J., at p. 166.
*353 Even the phrase "comprehensive plan" means little unless we isolate the purpose which it is calculated to achieve. Simply stated, it must be designed to promote one or more of the following:
"* * * to lessen congestion in the streets; secure safety from fire, panic and other dangers; promote health, morals or the general welfare; provide adequate light and air; prevent the overcrowding of land or buildings; avoid undue concentration of population." R.S. 40:55-32.
Sealantic's (and the Commission's) charge that the 1959 amendment was not enacted for the common good is without merit. Fort Lee is essentially residential in nature. Having suffered a loss of ratables as aforesaid, it properly considered that the ultimate economic benefit to its citizenry would be enhanced by converting the Estates area into a commercial district to the extent possible. Prior to the amendment the area immediately west of the Estates tract was already a C-3 district. The amendment was no more than a logical extension designed to further promote the over-all welfare of the residents.
Nor can it be said that this was "spot zoning," designed solely to relieve a particular lot or lots from the general restrictions of the zone for the sole benefit of one or more individuals.
There was no proof offered to demonstrate any arbitrary or capricious conduct in violation of a comprehensive plan. If anything, the proofs tended to demonstrate a contrary situation. The combination of liberal construction, presumption of validity, and judicial restraint as regards municipal zoning laws, is a formidable obstacle in the path of those seeking to set them aside. Perhaps, as Justice Hall noted in his dissent in Vickers, supra, the familiar shibboleths have truly outlived their usefulness and have actually perverted the purpose for which they were created. Perhaps the familiar concepts are, indeed, in need of a drastic overhaul when they result in "unquestioning deference to the views of local officials." Vickers *354 v. Township Com. of Gloucester Tp., supra, 37 N.J., at p. 261. Be that as it may, consideration of the arguments and proofs offered to attack the validity of the amendment have led the court to conclude that the applicable criteria encompassed by the concept of a "comprehensive plan" have not been transcended.

THE PUBLIC SALE
In March 1959, pursuant to a duly advertised announcement, Properties purchased, at public sale, 96 lots in Parcel "A" for $128,500. The announcement of sale contained certain conditions, one of which was:
"12(c). The Borough of Fort Lee agrees that the highest bidder will not be compelled to close the title or purchase the premises in the event that the premises are not rezoned so as to permit apartment house, commercial or other business use on the lands and premises which are the subject matter of this sale." (Emphasis added)
Sealantic has pointed to this provision as evidencing the scheme between Properties and Fort Lee to circumvent the deed restrictions and defeat their entire understanding. Having found that the restrictions do not apply to the privately purchased lots, and that the zoning amendment was validly enacted, the argument is without merit. The promise of rezoning (which was actually effectuated one month later) was within the power of Fort Lee so long as it advanced the general welfare. Having found that the interests of the community were advanced, the promise to rezone is immaterial to a determination of the validity of the sale.
The Commission points an accusatory finger at yet another condition in the advertisement, regarding construction costs. Paragraph 12(b) states:
"The bidder covenants and agrees that he will commence construction of buildings and appurtenances involving construction costs of at least one million, five hundred thousand dollars * * *."
*355 It is argued that this provision was too vague and failed to apprise bidders of the type of construction expected of them.
In Jersey City Merchants Council v. Jersey City, 71 N.J. Super. 156 (App. Div. 1961), reversed 39 N.J. 42 (1962) the Appellate Division held that when a municipality advertises land for public sale pursuant to N.J.S.A. 40:60-26 it must specify sufficient norms or standards regarding the number, type and cost of buildings to be erected thereon. In that case no minimum cost was indicated, although the reason that the Appellate Division set the sale aside was due, inter alia, to the fact that one of the requirements had to be "to the satisfaction of the Chief Engineer." This utter lack of standard or norm said the court "is a trespass upon the statute" because it raised the possibility of partiality or fraud. Moreover, the advertisement also required the erection by the successful bidder of "a non-residential building or buildings covering a ground area of 500,000 square feet." This, said the court, lacks "even the barest minimum of a specification or standard * * *." 71 N.J. Super., at p. 165.
On appeal, the decision was reversed. The Supreme Court, in an opinion by Justice Haneman, observed that underlying the public bidding statutes relating to both the sale of realty and the award of contracts for the performance of work and the supplying of materials was the policy requiring that:
"[a] `public body shall prescribe a common standard on all matters that are material to the proposals, to the end that interested persons may bid intelligently and will be induced to bid by the promise of impartiality which only specifications of that quality can give.' Greenberg v. Fornicola, 37 N.J. 1, [6] (1962)." 39 N.J., at pp. 51-52.
As the court so aptly stated, "each case must be considered on its own facts for the purpose of ascertaining whether such standard has been met." Ibid., at p. 54.
The paragraph in question (12(b)) does not violate the statute within the principles enunciated. The recital of a minimum cost raises no patent ambiguity or uncertainty *356 when considered in the light of the entire advertisement. Cf. Nativo v. Hackensack, 76 N.J. Super. 512, 521 (App. Div. 1962).
The court finds that the public sale was validly advertised and validly consummated, and that it did not constitute a step in an inequitable scheme to deprive Sealantic and/or the Commission of the benefit of the 1956 transactions with Fort Lee.

THE STREET VACATION ORDINANCE
In March 1961 the borough council of Fort Lee introduced Ordinance 1097 which was designed to vacate the paper street known as Cliff Avenue, in its entirety, and a portion of Old Fort Boulevard, a similar paper street. In May 1961 the ordinance was approved on final reading pursuant to a recommendation by the borough planning board. As a result, the streets reverted to Properties as abutting owner and conveniently enlarged the "unrestricted area." Admittedly, Properties applied for and gave impetus to this action.
Sealantic contends that the action was "palpably not in the service of the public interest," see Pyatt v. Mayor and Council of Dunellen, 9 N.J. 548, 554 (1952), and argues that this action was yet another step in the inequitable scheme of Fort Lee and Properties and, at the very least, should have imposed upon the abutting owner certain conditions designed to preserve the integrity of the Palisades skyline.
These streets were, as noted, "paper streets" laid out on the map of Estates area filed in 1927. From the testimony and exhibits offered at trial, and by virtue of my having viewed the locus in quo, the court is satisfied that the present character of the terrain upon which these streets are laid out would make such construction both functionally impractical and pecuniarily prohibitive. The vacation, in the abstract, was justifiable and certainly consonant with the over-all plan envisioned for the development of the Estates by Properties. *357 Just as was noted with regard to the zoning amendment, the contention that the street vacations advanced a community interest is entitled to a prima facie presumption of validity, and the mere admixture of private and public interests is by no means fatal. It has long been settled that unless "the public interests have been glaringly sacrificed to subserve private ends," Kean v. Elizabeth, 54 N.J.L. 462, 466 (Sup. Ct. 1892), affirmed 55 N.J.L. 337 (E. & A. 1893), a street vacation which coincidentally aids a private individual in a material manner is perfectly valid.
The Pyatt case, supra, contains the guidelines for a disposition of the instant issue. In that case the defendant municipality had, by ordinances, vacated a large segment of one street and provided a detour for another, both at the instance of an abutting industrial owner (the largest in Dunellen) which employed a substantial percentage of the local work force and paid 15% of the borough's tax revenue. The owner had informed the borough fathers that it was necessary to expand facilities; that unless it could expand across a certain street "it would be necessary * * * to move the plant to another municipality * * *." 9 N.J., at p. 552. The ordinances were passed with the deciding votes being cast by councilmen who were, at the time, employed by the company. The Supreme Court struck down the ordinances on the ground that the self-interest of the two councilmen should have disqualified them since it made impartial deliberation impossible. The court did, however, expound upon the nature of a municipality's power to vacate streets:
"The discretion of a governing body when exercising the power to vacate streets delegated to municipalities under R.S. 40:67-1(b), N.J.S.A. is not * * * limited [to a finding that the vacated portion is useless as a street]. The governing body is not restricted to the consideration merely of the continuing utility of the street proposed to be vacated. The controlling criterion is whether the closing will be in the service of the general public interest. To that inquiry whatever is relevant for or against the proposed closing and bears upon the public interest in the particular circumstances ordinarily not only may, but should, be considered. The judicial *358 superintendence is confined largely to ascertaining whether factors other than such as bear upon the public welfare influenced the action in a manner which vitiates it. The policy and wisdom of the vacation of a street when founded upon considerations confined to the service of the public interest is not the concern of the courts. The rule is that `* * * unless tainted with fraud, or palpably not in the service of the public interest, or otherwise a clear perversion of power,' there is no occasion for judicial intervention. Con Realty Co. v. Ellenstein, 125 N.J.L. 196 (Sup. Ct. 1940); Downs v. Mayor, etc., of South Amboy, 116 N.J.L. 511 (E. & A. 1936); Kean v. City of Elizabeth, 54 N.J.L. 462 (Sup. Ct. 1892), affirmed 55 N.J.L. 337 (E. & A. 1893); Sherwood v. City of Paterson, 88 N.J.L. 456 (Sup. Ct. 1915), affirmed 88 N.J.L. 738 (E. & A. 1916); 11 McQuillin, Municipal Corporations (3 ed. 1950), p. 133." 9 N.J., at pp. 553-554.
This lengthy quotation is worthy of consideration in the present context. At the outset, it is the opinion of this court that within the salutary principles therein enunciated the vacations in question were made for the common good and did, in fact, serve the public interest. The uselessness of the streets as avenues of vehicular travel is manifest. This being so, the over-all intent of the entire course of events leading up to the commencement by Properties of their motel complex, which the court finds to have been proper as regards the 1959 public sale and zoning amendment, encompasses the street vacation ordinances as well. Indeed, the burden of justification need not be placed upon the borough unless and until the parties attacking the action demonstrate a palpable failure to serve the common good. This has not been done. The inherent fallacy in Sealantic's argument itself reveals the correctness of the conclusion. As Sealantic has admitted, had not Properties demonstrated an intent to violate the 320-foot height restriction, it (Sealantic) would not even have brought this action. Without the support of the underlying argument of unfair conduct, the naked allegations concerning Fort Lee's exercise of various governmental functions are wholly insubstantial. In short, "the fact that private interests are incidentally served is not necessarily fatal, if the legislative decision to vacate is arguably in the public interest as well." *359 Cunningham and Tischler, "Dedication of Land in New Jersey," 15 Rutgers L. Rev. 377, 412 (1961).
Where a vacation of public rights in a dedicated street destroys the rights of landowners to enjoy all reasonable access to a public highway, those landowners may have an action for damages to their property. Highway Holding Co. v. Yara Engineering Corp., 22 N.J. 119 (1956). Even this right is confined to instances where, in fact, the street was accepted as a public highway by proper authority. Moreover,
"If abutting owners on such vacated streets or other streets shown on the filed map as entering or crossing the vacated streets have rights of way of access to other streets on the map or actual existing public highways in law, whether on the map or not, the damages to the user of the properties of such abutting owners are as a practical matter so inconsequential and speculative that they could not in all probability be established with any degree of exactness, if they could be at all. Cf. Dodge v. Pennsylvania R.R. Co., [43 N.J. Eq. 351 (Ch. 1887)] supra." 22 N.J., at p. 135.
The question of reasonable access is one of fact. Mueller v. New Jersey Highway Authority, 59 N.J. Super. 583, 595 (App. Div. 1960). So long as the property owner has free and convenient access to his property, he has been deprived of no right in the instant context.
Without deciding whether Cliff Avenue and Old Fort Boulevard were "accepted," see Cunningham v. Tischler, op. cit., supra, at pp. 395-399, the court finds a complete lack of any proof tending to establish a deprivation of private access rights to a public highway by any party. The maintenance of Plaza Street, unaffected by the vacation ordinance, provides a reasonable and adequate means of ingress and egress to and from the other interested properties. Having made this finding the court need not pass upon the additional issue raised by Properties concerning the propriety of injunctive relief. See, e.g., Paramus v. Bergen County, 25 N.J. 492, 496-7 (1958).
The Commission has advanced a contention to the effect that there is an overriding public policy which has been violated *360 by the activities of Fort Lee. In essence, it is urged that the Legislature of New Jersey has expressly recognized, through various enactments (see N.J.S.A. 32:14-1 et seq.), supra, that the maintenance of the scenic and historic integrity of the Palisades may not be encroached upon or hindered by municipal action merely inconsistent therewith. N.J. Const., Art. IV, Sec. VII, par. 11. This argument is a companion to that of Sealantic regarding Fort Lee's alleged disregard of the effect which its actions may have upon neighboring lands. See, e.g., Duffcon Concrete Products, Inc. v. Cresskill, 1 N.J. 509 (1949); Cresskill v. Dumont, 15 N.J. 238 (1954). Again, the finding of validity as to the reasons which prompted the governmental actions and their consequences in regard to the comprehensive plan concept largely undermines the thrust of these attacks.
More important, the court fails to perceive any statutory language which, in furtherance of a public policy, immunizes the Palisades area from action taken by adjoining municipalities which can conceivably be regarded as obstructive to the purpose of maintaining the park's integrity. There is no direction to the effect that Fort Lee must, in the abstract, avoid coming into conflict with the Commission's purposes. See, e.g., Kennedy v. Newark, 29 N.J. 178, 187 (1959). In point of fact, although the Commission is authorized to acquire private lands on the face of the Palisades by eminent domain, the property on top of the cliffs was expressly exempted therefrom. N.J.S.A. 32:14-6.
As was observed earlier, preservation of the Palisades area for scenic, historic and recreational purposes is a most noble and worthy undertaking. In his testimony, Mr. Laurance Rockefeller clearly indicated a deep love of nature. His qualifications and background as an expert in outdoor recreation are enviable. He reflected a man thoroughly qualified to supervise the building, from its inception, of any type of an outdoor project  parks, forests, lakes and beaches. Mr. John D. Rockefeller, Jr.'s book, The Heritage of Every American, which was offered in evidence and read by the court, is most *361 enlightening. It unequivocally paints a picture of a family striving to maintain the natural beauty of many portions of this country and world. The citizenry of America is substantially indebted for this effort. Mr. Laurance Rockefeller's official assignments on a city, state, national and international level are sufficiently varied and eminently productive to enable one to evaluate the worth of this individual. He truly reflects the belief that outdoor recreation satisfies man's need for a mental lift. He is a conservationist in the real sense.
Nevertheless, due regard must be given to the sanctity of local government authority which, while perhaps interfering with this objective, is entitled to equal consideration at least. I find no public policy requiring Fort Lee to restrict the property in question in order to further the aims of Sealantic and the Commission. The borough has the perfect right to stem the tide which has already placed a good part of its land in the hands of tax-exempt organizations, albeit the borough has not been deprived altogether of necessary revenue. See e.g., Palisades Interstate Park Comm. v. Fort Lee, 69 N.J. Super. 269, 275 (App. Div. 1961); N.J.S.A. 54:4A-4 et seq. Absent any substantial proof of an evil design or corrupt bargain intended solely to benefit Properties at the expense of other parties in interest, be they Sealantic, the Commission or anyone else, this court is obliged to hold that there has been no violation of public policy or undue deprivation of the rights of neighboring municipalities. There has not been, nor has it been shown that there will be, any action by the Borough of Fort Lee with respect to the property in question which was or will be invalid, illegal, ultra vires, or otherwise improper. Nor is there any valid ground for reformation of the deeds from Sealantic to the borough, or of the contract and agreement between them, or of the borough's declaration of restrictions.
The amended pretrial order raises an issue regarding the applicability of the equitable defenses of unclean hands, estoppel and laches. The foregoing opinion, already lengthy, need not be burdened with a detailed discussion of these *362 issues. Suffice it to say that the court finds no justification under the circumstances for raising any one of these defenses as a bar to the various reliefs sought.
The interlocutory injunctive relief previously entered against the Borough of Fort Lee and Properties is vacated in all respects. Counsel may present judgment in accordance with this opinion.